Joseph M. Alioto (SBN 42680)
Jamie L. Miller (SBN 271452)
Thomas P. Pier (SBN 235740)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Email:  jmalioto@aliotolaw.com
        jmiller@aliotolaw.com

[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH DEAN BRADT, TIM NIEBOER, PAM WARD, VALERIE JOLLY, JUNE STANSBURY, KATHERINE ARCELL, CHRISTINE WHALEN, JOSE BRITO, BRENDA DAVIS, PAM FAUST, CAROLYN FJORD, GABE GARAVANIAN, HARRY GARAVANIAN, JOCELYN GARDNER, MIKE MALANEY, LEN MARAZZO, LISA MCCARTHY, DEBORAH PULFER, WILLIAM RUBINSOHN, SONDRA RUSSELL, CLYDE STENSRUD, GARY TALEWSKY, DIANE ULTICAN and JEFFREY NICKERSON,<br><br>          Plaintiffs,<br>     v.<br><br>T-MOBILE US, INC., DEUTSCHE TELEKOM AG, SPRINT CORPORATION, and SOFTBANK GROUP CORP,<br><br>          Defendants. | CASE NO.:<br><br>COMPLAINT TO PROHIBIT THE MERGER OF SPRINT BY T-MOBILE IN VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18, AND SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1 |

## INTRODUCTION

1.     The telecommunications industry in the United States is a huge and vitally important component of the economic engine that serves to propel and innovate our economy and to define our identity as a nation.  There are more cellular phones in

the United States than there are people.

2.     There are now four companies in the United States that control 98.7% of the cellular telecommunications market.  These four companies are Verizon, AT&T, T-Mobile and Sprint.  The number three company, T-Mobile, now proposes to merge with the number four company, Sprint.

3.     As a result of this merger the new T-Mobile would command 29.7% of the national market share for voice calls and text in the United States.  The further result would be to concentrate the nation's critical communications facilities in only three companies that will command nearly 99% of the market - one of which companies is foreign-owned and controlled.  This is an open and blatant violation of the antitrust laws as has been defined and underscored in the benchmark opinions our Supreme Court.

4.     The economic policy of the United States Congress, endorsed by the United States Supreme Court, is to promote competition over combination.[1] Competition spurs investment and jobs, stimulates output and creates greater consumer choice.

5.     The merger of T-MOBILE and SPRINT now threatens to subvert this policy by accelerating an anticompetitive trend toward hegemony in the telecommunications industry that will have drastic strategic consequences for the country.

6.     Plaintiffs have filed this suit to take a stand in favor of competition over concentration in this marketplace and to "call a halt" to the trend toward domination by megaliths.[2]

---

[1] "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive mergers. Section 7 was enacted to prevent even small mergers that added to concentration in an industry. See S. Rep. No. 1775, 81st Cong., 2d Sess. 5." Footnote 72, *Brown Shoe v. United States*, 370 U.S. 294, at 345 (1962).
[2] "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a

7.     This is a private antitrust action seeking an Order of the Court prohibiting the proposed merger and resulting elimination of SPRINT COPRORATION (hereinafter SPRINT) by T-MOBILE US (hereinafter T-MOBILE) as a violation of the antitrust laws.

8.     This merger will create a "threatened loss or damage" to the Plaintiffs and to the public at-large should SPRINT be eliminated the effect of which may be to increase prices because SPRINT is currently the low-cost competitor among the four national competitors in the marketplace.  Furthermore, SPRINT's cellular service covers over 93% of the United States population. Its merger will eliminate 17% of the nationwide wireless services market currently serviced by SPRINT and will reduce the number of competitors in the market from four to three, with the result that the three remaining companies will control 98.7% of the market, far greater than any concentration previously permitted under the Supreme Court decisions.

9.     T-MOBILE's merger of SPRINT for $26 billion in cash is both substantial and non-trivial and the combined companies will be valued at $146 billion. The company's ownership will be split three ways, with Deutsche Telekom owning 41.7 percent and SoftBank Group holding 27.4 percent. The remaining 30.9 percent will be publicly owned.

hundred cities at a time. In the light of the trends in this industry we agree with the Government and the court below that this is an appropriate place at which to call a halt.  *Id*. at 346.

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

10.     The combined company will have more than 130 million customers, closing in on rivals AT&T which is first with 154 million subscribers and Verizon which is second with 150 million. T-Mobile is currently the third largest carrier in the U.S. with 77.3 million subscribers, while Sprint is currently fourth with approximately 53.5 million customers.

11.     The proposed merger is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) in that the effect of the elimination of Sprint may be "substantially to lessen competition, or tend to create a monopoly" in the retail mobile wireless services market in the United States.[3]

12.     The proposed merger is prohibited by the binding authority of the Supreme Court of the United States in its decisions in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), *United States v. Aluminum Company of America*, 377 U.S. 271 (1964), *United*

---

[3] Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such merger may be substantially to lessen competition, or tend to create a monopoly."

*States v. Von's Grocery Co*, 384 U.S. 270 (1966), *United States v. Pabst Brewing Co.,* 384 U.S. 546 (1966), and *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).

JURISDICTION

13.    This private action is specifically authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) which provides in pertinent part that "any person…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws."

14.    The private action to vigorously challenge a merger is encouraged by the Congress and the Supreme Court of the United States.  In strong and unmistakable language, the Supreme Court has declared in its American Stores opinion: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. American Stores Company*, 495 U.S. 271, 284 (1990).

15.    Plaintiffs therefore bring this action under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and allege that the proposed elimination of SPRINT by T-MOBILE constitutes a substantial threat of injury to the Plaintiffs because the merger may have the effect "substantially to lessen competition and tend to create a monopoly" in the United States in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).  In addition, the contract to eliminate SPRINT constitutes a "contract, combination in the form of a trust or otherwise, or conspiracy" as an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act[4] in that, among other things, it is a non-trivial transaction between significant rivals, neither of which is a failing company, that eliminates a substantial and growing competitor from the market.

16.    The proposed merger is in and substantially affects the interstate and foreign commerce of the United States in that wireless voice-calls, messaging and data and all the accoutrements and other necessities of the wireless telecommunications

---

[4] 15 U.S.C. §1.

industry are in the constant flow of the interstate and foreign commerce of the United States.  In addition, because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

17.    Plaintiffs seek an Order from the Court prohibiting the proposed merger by T-MOBILE to eliminate SPRINT as a significant competitor.

<u>THE INDUSTRY</u>

18.    The wireless telecommunications industry is a critical and vital modern necessity to the commercial, social and political well-being of the United States. Competition rather than combination is the rule of trade in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits of competition, including, inter alia, the best possible services at the lowest possible prices. Vigorous enforcement of the antitrust laws by private persons is an essential part of the Congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, especially including the telecommunications industry which has become and is now a vital element that supports not only this nation's economic vitality but also that underlies and supports this nation's democratic ideals and aspirations.

19.    The telecommunications industry in this country has experienced a furious feeding frenzy of mega-mergers which has resulted in the reduction of the major telecommunications companies from seven competitors to four, effectively, over the last 14 years, almost halving the principal competitive telecommunications choices to the general public since 2004.

20.    The continued independent existence of SPRINT constitutes the single most important bulwark to block this almost unstoppable trend toward complete concentration and domination in the telecommunications industry.

21.    In 2002, there were seven national wireless carriers in the U.S.: AT&T, Verizon, Sprint, T- Mobile, Nextel, AllTel and Cingular. In a consolidation spree that began in 2004, Cingular acquired AT&T. This was followed by Sprint's merger of

Nextel in 2005—a merger that has been called one of the "worst mergers ever."[5]

22.    A T-MOBILE merger of SPRINT would leave three roughly equal-sized firms in the national wireless market, with the merged Sprint-T-Mobile ("New T-Mobile") commanding approximately 29.7% of the national market share for voice calls and text, AT&T with 33.9% and Verizon with 35.1%.  These three firms would control almost 99% of the national U.S. wireless market.[6]

**Estimated Total Connections for Publicly Traded Facilities–Based Mobile Wireless Service Providers (in thousands): 2014–2017**

| Service Providers | EOY 2014 | EOY 2015 | EOY 2016 | EOY 2017 | EOY 2017 (% Market Share) |
|---|---|---|---|---|---|
| Verizon Wireless | 134,612 | 140,924 | 145,859 | 151,978 | 35.1 |
| AT&T | 120,620 | 128,679 | 134,875 | 146,847 | 33.9 |
| T-Mobile | 55,018 | 63,282 | 71,455 | 74,040 | 17.1 |
| Sprint | 55,929 | 58,578 | 59,515 | 54,683 | 12.6 |
| U.S. Cellular | 4,760 | 4,876 | 5,079 | 5,063 | 1.2 |
| Top 5 Service Providers Total | 370,939 | 396,339 | 416,783 | 432,611 | |

23.    Such oligopolistic market structures are highly conducive to anticompetitive coordination and collusion, and do not promote hard-nosed competition. Sprint and T-Mobile have demonstrated strong incentives to be aggressive competitors. By reducing prices and improving service quality, for example, the two firms can attract new subscribers and capture market share from AT&T and Verizon. In contrast, a merged Sprint-T-Mobile would have a much larger market share. With a bigger piece of the national wireless pie, the merged entity would likely find that maintaining a competitive "peace" with Verizon and AT&T is a more profitable tack

[5] In 2009, Verizon bought All-Tel. This was followed by AT&T's unsuccessful attempt to buy T-Mobile in 2011 and T-Mobile's successful merger of mobile virtual network operator (MVNO) Metro PCS. The DOJ and the FCC forced the abandonment of the AT&T-T- Mobile deal. Like Sprint-T-Mobile, it was also a 4-3 merger that would have eliminated T- Mobile, a smaller, efficient, and innovative player that set the industry bar high for the remaining rivals. AT&T's rationale that the merger with T-Mobile was essential for expanding to the then-impending 4G LTE network technology also did not pass muster. In August of 2014, two years after the abandoned attempt, Forbes magazine concluded that there would have been "no wireless wars without the blocked AT&T-T-Mobile merger."
[6] Certain smaller mobile virtual network operators would remain.  These operators include Trachoma, Republic Wireless, Jolt Mobile, Boost Mobile and Cricket Wireless which purchase access to cell towers and buy spectrum at wholesale from the larger players, reselling to their wireless subscribers.

than aggressively trying to gain market share from them.

24.     In the recent aborted AT&T-T-Mobile merger, both the DOJ and FCC found that the wireless market was conducive to coordinated manipulation. The government's complaint noted that "Certain aspects of mobile wireless telecommunications services markets, including transparent pricing, little buyer-side market power, and high barriers to entry and expansion, make them particularly conducive to coordination." The complaint concluded that the "substantial increase in concentration that would result from this merger, and the reduction in the number of nationwide providers from four to three, likely will lead to lessened competition due to an enhanced risk of anticompetitive coordination." The FCC also explained similarly that "[c]oordinated effects are of particular concern here because the retail mobile wireless services market, being relatively concentrated and hard to enter, appears conducive to coordination."

25.     Indeed, the DOJ recently opened an investigation into collusion by the two largest carriers, Verizon and AT&T and their industry standards organization, to inhibit consumer switching between wireless carriers. Now, inexplicably, the DOJ seeks to sanction this merger of the number 3 and 4 players in the telecommunications market. The rationale for the DOJ's position is currently unknown.[7]

_____

[7]     On July 26, 2019, the United States Department of Justice ("DOJ") filed a complaint in the District of Columbia, *United States, et al., v. Deutsche Telekom AG, et al.*, Case No. 1:19-cv-02234-TJK, to prevent the merger. Simultaneously the DOJ filed a negotiated final judgment and stipulation, reflecting the terms of a pre-arranged settlement with Defendants. The Proposed Settlement permits T-Mobile/Sprint proceed with the merger subject to divestiture of certain assets to DISH Network Corporation ("DISH"), a U.S. television provider that is not even currently a competitor in the mobile telecommunications market.

        In reaching its contorted settlement, and in an attempt to put lipstick on this pig, the DOJ cobbled together various assets and bestowed them on DISH, an inexperienced Pay-Tv provider, all the while keeping its fingers crossed that, in five to ten years, DISH may eventually become a competitive constraint on the three newly minted behemoths in the national wireless telecommunications market.

        Verizon has nearly 120 million cellphone customers. AT&T and the newly merged T-Mobile will each have over 90 million customers. Dish's upstart new network will be dwarfed by the incumbents.

        In point of fact, prior to the DOJ's arranged marriage, Charlie Ergen, DISH's founder and chief executive officer, had been the most outspoken critic of the T-Mobile merger. Having attempted to break-in to the cellular market on three prior occasions and having been rebuffed, Ergen could hardly contain his ironic good fortune when in May he answered a telephone call from John Legere, chief executive of T-Mobile, whose opening line to Ergen was: "Justice has said that we need a fourth carrier. We should talk if you are interested." This call had been motivated after staff lawyers at the DOJ had advised T-Mobile that the merger was in trouble because it would necessarily eliminate a fourth competitor.

        Justice urged the companies to cast off pieces of their business to create a fourth carrier that would fill the void left by absorbing Sprint. Justice had previously cast around to a number of other potential suitors such

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

26.     If collusion is possible in a 4-firm market, then it only gets easier in the 3-firm market that will result from a Sprint-T-Mobile combination. Coordinated conduct in the Big 3 oligopolies of remaining carriers could arise in any number of ways. The Big 3 would have stronger incentives to fix and increase prices or "follow" each other on pricing for wireless service plans and/or equipment. The Big 3 could collectively discontinue certain types of plans or forbear from introducing new, cheaper and better plans. The Big 3 would also have stronger incentives to divide up geographic markets within the U.S. or agree on "rules" that govern competition in the industry.

27.     The Sprint-T-Mobile merger would create a post-merger national mobile wireless market that would dramatically reduce incentives for the remaining Big 3 carriers to compete and strengthen incentives for them to engage in anticompetitive coordination. Such mergers have long been recognized as particularly damaging to competition and consumers.

28.     If this proposed elimination of T-Mobile is consummated, the rates for telephone services may likely increase substantially.[8]

---

as cable operators Altice USA Inc. and Charter Communications Inc. and Comcast Corp in an attempt to prop up the merger by adding a fourth cellular "player" that could give the merger "cover" from antitrust scrutiny. Justice eventually settled on DISH – a company with no cellular track record and no wireless customers – to create the fourth "viable competitor" needed to approve the deal.

[8] Because of T-Mobile's aggressive competition and innovation in the wake of its failed merger, all major wireless carriers began offering installment pricing on new phones and more data for lower prices.   See https://www.forbes.com/sites/markrogowsky/2014/08/27/t-mobile-and-sprint-continue-to-battle-thanks-to-the-government/#293eeab93160 .

Because of T-Mobile's aggressive competition and innovation, it has had the greatest share of "retail net adds,"—greater than any other national wireless service provider.  Since December 31, 2014, T-Mobile has gained 17.5 million subscribers out of an industry total of 29.6 million new retail subscribers.

Mergers often stifle existing organic growth trends, as the merged entity is weakened by the burdens of post-merger integration.  The wireless industry is no exception.  Sprint's merger of Nextel is a well- known industry M&A failure.  By 2013, Sprint did away with Nextel's network in its entirety.  Notwithstanding Sprint's disastrous M&A history, it now seeks permission to merge with T-Mobile.  The merger is likely to slow or stall the substantial internal growth undertaken by T-Mobile as a standalone competitor.

Further, a 2016-study that evaluated a decade of manufacturing mergers found no evidence of post-merger increases in productivity.  Blonigen, Bruce A., and Justin R. Pierce (2016). "Evidence for the Effects of Mergers on Market Power and Efficiency," Finance and Economics Discussion Series 2016-082. Washington: Board of Governors of the Federal Reserve System, https://doi.org/10.17016/FEDS.2016.082, at p. 3.

The proposed merger is likely to lead to price increases for consumers.  The Defendants' promise to the FCC that post-merger, the New T-Mobile will not increase prices for three years is tantamount to an admission that prices will increase.  Indeed, reports done by economists for Sprint and T-Mobile establish that the merger is likely to cost Sprint and T-Mobile customers at least $4.5 billion annually.  The harm to all mobile wireless subscribers is likely to be even greater.  AG Complaint, Filed September 18, 2019, at ¶ 6.

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1

2        29.     The merger would eliminate the competition between SPRINT and T-

3   MOBILE the wireless industry's two disruptive wireless carriers.

4        30.     Preserving the positive competitive dynamics that a disruptive rival

5   creates was the major reason why the DOJ opposed the merger of AT&T and T-Mobile

6   in 2011. Mergers that eliminate such mavericks are particularly likely to result in

7   anticompetitive post-merger coordination. As the DOJ's complaint noted "T-Mobile in

8   particular—a company with a self-described 'challenger brand,' that historically has

9   been a value provider, and that even within the past few months had been developing

10  and deploying 'disruptive pricing' plans— places important competitive pressure on its

11  three larger rivals. . .. AT&T's elimination of T- Mobile as an independent, low-priced

12  rival would remove a significant competitive force from the market."

13       31.     The loss of "disruptive rivalry" that a merger of Sprint and T-Mobile

14  would entail is equally important here, but for a different reason than in the AT&T-T-

15  Mobile case. As the third and fourth largest carriers in the Big 4, both Sprint and T-

16  Mobile have differentiated themselves from Verizon and AT&T through aggressive

17  price and non-price competition. They compete head-to-head for consumers that may

18  not be able to afford more expensive Verizon and AT&T plans or who do not need the

19  more extensive variety of plans offered by the two largest carriers. Pricing data on

20  monthly wireless plans offered by the Big 4 illustrate this important dynamic and its

21  implications for the potential loss of head-to-head competition between Sprint and T-

    Mobile.

22        A consumer group, Free Press, noted that, a "supposed three-year price freeze is meaningless in a

23  wireless market where prices are falling and likely would continue to drop in the absence of this merger…The
    little bit of price competition people have enjoyed thanks to the rivalry between Sprint and T-Mobile could keep
24  sending prices lower.  So a meaningless and unenforceable promise to just tread water where we are now is a sad
    joke, and nothing more." https://www.theverge.com/2019/5/21/18634195/t-mobile-sprint-merger-conditions-
    access-coverage
25        Further, a retrospective study of mergers by Dr. John Kwoka concluded that mergers in highly
    concentrated industries result in price increases.  John Kwoka, *The Structural Presumption and the Safe Harbor
26  in Merger Review:  False Positives or Unwarranted Concerns?*  81 Antitrust L.J. 837, 860-61 (2017).
          The study found that in transactions with post-merger HHIs of 3,000 price increases developed in 88%
27  of cases.  In transactions with post-merger HHI of 3,500, that percentage increased to 92.9%.  In addition, in
    transactions in which there were five or fewer remaining competitors, prices increased 100% of the time.

28

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and
Section 1 of the Sherman Act*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

32.     For example, in Figures A-10 and A-11 below, taken from the FCC Communications Marketplace Report published by the FCC and dated November 21, 2018, the 2018 data for plan rates indicate that Sprint offers the cheapest, limited 2 GB data plan for one line. For unlimited data, Sprint and T- Mobile are consistently the lowest cost carriers for a plan with two or more lines.



33.     Eliminating competition between Sprint and T-Mobile would likely dull the merged company's incentives to compete vigorously, creating upward pressure on retail plan prices.

34.     With an ever-increasing and loyal customer base, SPRINT is eyed as a very substantial and dangerous competitive threat to the status quo, and especially to its significant rival, T-MOBILE.

35.     The merger and consequent elimination of SPRINT as a competitor by T-MOBILE may, and most probably will, result in higher wireless rates, less service, fewer amenities and accommodations, the firing hundreds of SPRINT employees, the eradication of consumer choice, along with other anticompetitive effects that may, and most probably will, flow from the elimination of SPRINT from the market – a manifest irreparable harm that once lost may never be revived.

36.     Charts provided by the FCC Communications Marketplace Report show that SPRINT has reduced its prices per megabyte from 2014 through 2017 and that in 2016 and 2017 SPRINT was the lowest priced carrier of the four top cellular providers.

**Fig. A-14**
**ARPU Estimates of Publicly Traded Facilities-Based Mobile Wireless Service Providers 4th Quarter 2014–4th Quarter 2017**

| Nationwide Providers | 4Q14 | 4Q15 | 4Q16 | 4Q17 |
|---|---|---|---|---|
| AT&T | $42.04 | $38.78 | $36.58 | $34.13 |
| Sprint | $40.44 | $35.54 | $32.03 | $32.49 |
| T-Mobile | $35.56 | $34.53 | $33.80 | $35.62 |
| Verizon Wireless | $45.52 | $40.99 | $37.52 | $35.27 |
| U.S. Cellular | $53.58 | $49.32 | $49.03 | $46.89 |
| **Industry ARPU** | **$42.27** | **$38.54** | **$35.93** | **$34.73** |

37.     During the same period from 2016 through 2017 Sprint was able to increase its investment in capital expenditures.



Fig. A-16
Yearly Capital Expenditures by Service Provider
2010 - 2017

38.     As a result, it is apparent that SPRINT has the wherewithal, the experience, the knowledge, and the ability to expand on its own, which would serve to increase competition, lower prices, necessitate the creation of new jobs, increase consumer choice, invite investment, and otherwise allow the consumer to enjoy the benefits that competition always provides.

39.     The proposed elimination of SPRINT by T-MOBILE poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed elimination will only serve, as the Supreme Court warned, to "reduce available consumer choice while providing no increase in industry capacity, jobs or output", and may lessen competition in each of the product and geographical markets in which T-Mobile and Sprint compete, and will potentially cause loss to the Plaintiffs, and the public at large, in the form of higher rates, less customer service, less expansion of wireless network, curtailment of capacity, far fewer services and amenities, the elimination of consumer choice and other potential anticompetitive effects which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition. And, as is customary in these

anticompetitive mergers, the first casualties of the removal of competition will be the firing of employees who were only needed when competition existed.

40.    The elimination SPRINT is manifestly an irreparable harm since competition would be irretrievably lost. SPRINT is a significant, unique and, in fact, the penultimate competitor of not only T-MOBILE, but also directly against the major wireless carriers Verizon and AT&T.  SPRINT is a vigorous competitor impacting and constraining those carriers nationally, on the West Coast, and in California. Because SPRINT offers premium services at lower rates, the major wireless operators are constrained from taking their oligopoly to absolutely obscene limits (although they are close) since, if they should attempt to do so, the consumer public would switch to SPRINT or T-Mobile, which many have in fact already done with frequency.

41.    SPRINT, more than any other competitor, starkly illustrates the competitive risk that T-MOBILE, Verizon and AT&T would face should consumers have a choice to switch to SPRINT when the larger carriers push their anticompetitive practices to extremes that even otherwise loyal customers can no longer tolerate.

## THE PARTIES

### Plaintiffs

42.    The Plaintiffs named below are individuals who are citizens of the cities and states listed.  Each Plaintiff is customer of a national cellular mobile service provider. The potential elimination of SPRINT will cause loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of the competition that SPRINT brings.

| Plaintiff | State of Residence |
| --- | --- |
| Keith Dean Bradt | Nevada |
| Tim Nieboer | Michigan |
| Pam Ward | Florida |
| Valerie Jolly | Texas |
| June Stansbury | Nevada |
| Katherine Arcell | Louisiana |
| Christine Whalen | Louisiana |
| Jose Brito | Nevada |
| Brenda Davis | Texas |
| Pam Faust | Ohio |

| | |
|---|---|
| Carolyn Fjord | California |
| Gabe Garavanian | Massachusetts |
| Harry Garavanian | Massachusetts |
| Jocelyn Gardner | Colorado |
| Mike Malaney | Michigan |
| Len Marazzo | Nevada |
| Lisa McCarthy | Florida |
| Deborah Pulfer | Ohio |
| William Rubinsohn | Pennsylvania |
| Sondra Russell | Texas |
| Clyde Stensrud | Washington |
| Gary Talewsky | Massachusetts |
| Diane Ultican | Washington |
| Jeffrey Nickerson | Massachusetts |

<u>Defendants</u>

43.     Defendant T-Mobile is a corporation organized and existing under the laws of the State of Delaware with its headquarters in Bellevue, Washington. T-Mobile is one of the world's largest providers of communications services, and the third-largest mobile wireless telecommunications services provider in the United States, as measured by subscribers.

44.     Defendant Deutsche Telekom AG is a German corporation headquartered in Bonn, Germany. It is the largest telecommunications operator in Europe with wireline and wireless interests in more than 50 countries around the world and total annual revenues in 2018 of approximately $86 billion. Deutsche Telekom AG controls T-Mobile and indirectly holds approximately 63% of T-Mobile's stock.  As of October 2019, the German government held a 14.5% stake in Deutsche Telekom stock directly, and another 17.4% through the government bank KfW.

45.     Defendants Sprint is a corporation organized and existing under the laws of the State of Delaware with its headquarters in Overland Park, Kansas. Sprint is the fourth-largest wireless carrier in the United States, serving approximately 54 million customers at the end of 2018, and provides mobile wireless telecommunications services to residential and business customers throughout the United States

46.     Defendant SoftBank Group Corp. ("SoftBank") is a multinational holding conglomerate headquartered in Tokyo, Japan. SoftBank is led by its founder,

Masayoshi Son. SoftBank had revenues of $85 billion in fiscal year 2018. SoftBank controls Sprint and indirectly holds approximately 85% of Sprint's stock.

RELEVANT MARKETS

Relevant Product Markets

47.     The development over the last twenty-five years of mobile domestic wireless voice, messaging and data telecommunications has enabled consumers to access voice and data communications networks quickly and efficiently from anywhere in the United States.

48.     Retail mobile wireless telecommunications services is a line of commerce or product market under Section 7 of the Clayton Act, 15 U.S.C. § 18. Mobile wireless telecommunications services include voice, text, and data services offered to residential and business consumers.  Mobile wireless telecommunications companies provide voice and data services on a wide assortment of devices, including smartphones, tablets, and other mobile communications devices.[9]

49.     The Communications Marketplace Report adopted by the FCC in December 2018 estimates that as of the end of 2017, there were 411 million wireless connections/subscribers in the United States.[10]

50.     In 2017, mobile wireless telecommunication service revenues in the United States were approximately $179 billion and the market is growing.[11]

51.     Because fixed wireless services and wireline services are not mobile, they are not regarded by consumers of mobile wireless services as reasonable substitutes.

52.     As of year-end 2017, there were four facilities-based mobile wireless service providers in the United States that are typically described as "nationwide": AT&T, Sprint, T-Mobile, and Verizon Wireless. Although none of these four nationwide service providers has a network that is truly ubiquitous, all four service providers have networks that cover at least 90% of the population with Long Term

---

[9]  DOJ, AT&T/T-Mobile Complaint at ¶ 11.
[10] https://docs.fcc.gov/public/attachments/DOC-355217A1.pdf, Communications Marketplace Report at p. 6.
[11] http://fortune.com/2018/07/10/cell-phone-wireless-industry/

Evolution (LTE).  Collectively, these four service providers account for over 400 million connections.

Relevant Geographic Markets

53.     The entire United States is a geographic market for purposes of this action. Rates are generally constrained by actual and potential competition from other wireless providers within a market.  National competition among the national carriers is illustrated by the billions of dollars spent on national wireless advertising.  Even the Big 4 carriers themselves acknowledge a national wireless market. In its merger of the regional carrier Centennial, for example, AT&T claimed that "the predominant forces driving competition among wireless carriers operate at the national level. . .. AT&T establishes its rate plans and pricing on a national basis . . .."

54.     As a result, the United States constitutes a relevant geographic market.

ANTICOMPETITTIVE EFFECTS OF THE TRANSACTION

55.     On April 29, 2018, T-Mobile and Sprint announced in a $26 billion deal that they would merge to form a new company under the name T-Mobile.

56.     The proposed merger will eliminate SPRINT as a substantial "price disruptor" in the relevant market.  Post-merger wireless rates may increase and there may be less discounting on wireless voice and text service.

57.     The proposed merger will create absentee ownership and management of T-MOBILE from Germany and Japan, may eliminate SPRINT management jobs in Kansas and across the United States, and will certainly increase and concentrate an oligopolistic U.S. market in three large telecommunications behemoths.

58.     The proposed elimination of SPRINT may result in the cancellation of orders for new capital improvements and equipment.  It is very probable that SPRINT's merger may lead to further capacity and employee reductions which will necessarily serve to drive prices upward - and customer service and satisfaction downward.

59.     If SPRINT is eliminated, T-MOBILE will operate in a highly concentrated market.  As a consequence, the potential for effective collusion among the

remaining wireless carriers may substantially increase while capacity and service may be cut and rates may rise.

60.     The competition from SPRINT, which had openly challenged the more traditional telecommunications carriers' mantra of higher prices by offering lower rates for voice, data and messaging will have been eliminated.

61.     Ultimately, T-MOBILE'S proposed elimination of SPRINT may, and probably will, result in significant and irreparable harm and inconvenience to consumers, including the Plaintiffs, by propelling rates higher, reducing the number of rate plans that will be offered to consumers, and eliminating an innovative, imaginative, and low-priced wireless competitor from the industry.

The Relevant Markets Are Highly Concentrated and the Proposed Elimination of SPRINT Will Result in Presumptively Unlawful Market Concentrations

62.     The decrease in the number of major wireless carriers over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. retail mobile wireless voice, messaging and data telecommunications industry, a trend which the Supreme Court has said must be arrested in its incipiency.

63.     Based on figures presented in the FCC Communications Marketplace report, which was adopted by the FCC in December 2018, the market shares in connections maintained by the four national wireless communication service providers in the United States in 2017 are as follows:  Verizon – 35.1%; AT&T – 33.9%; T-Mobile – 17.1%; and Sprint 12.6%.[12]

//

//

//

//

//

//

---

[12] FCC Communications Marketplace Report at p. 8, excluding regional carrier U.S. Cellular.

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

**Fig. A-3**
**Estimated Total Connections for Publicly Traded Facilities–Based Mobile Wireless Service
Providers (in thousands): 2014–2017**

| Service Providers | EOY 2014 | EOY 2015 | EOY 2016 | EOY 2017 | EOY 2017 (% Market Share) |
|---|---|---|---|---|---|
| Verizon Wireless | 134,612 | 140,924 | 145,859 | 151,978 | 35.1 |
| AT&T | 120,620 | 128,679 | 134,875 | 146,847 | 33.9 |
| T-Mobile | 55,018 | 63,282 | 71,455 | 74,040 | 17.1 |
| Sprint | 55,929 | 58,578 | 59,515 | 54,683 | 12.6 |
| U.S. Cellular | 4,760 | 4,876 | 5,079 | 5,063 | 1.2 |
| Top 5 Service Providers Total | 370,939 | 396,339 | 416,783 | 432,611 | |

64.     The elimination of SPRINT by T-MOBILE will result in the formation of
the third largest wireless carrier in the United States with over 29.7% of the total
mobile wireless service market connections in an already highly concentrated market
where the biggest two wireless carriers, AT&T and Verizon, market share is already
over 69% of all wireless connections.  Ultimately such a total 98.7% concentration of
market share in three firms is unacceptably high, and will ineluctably lead to collusion.

65.     The United States Supreme Court has consistently condemned the
reduction of competitors in markets far less concentrated than the market that exists
today in the United States for cellular telecommunications.

66.     For example, in the *United States v. Von's Grocery Company* where the
four largest firms controlled 24.4% of the market, the Court enjoined the merger of the
number 3 firm with the number 6 firm that would have created a number 2 firm with a
market share of only 7.5%.

67.     In *United States v. Aluminum Company of America*, the Court enjoined a
merger where the number one firm sought to merge with the number 9 firm where the
top four firms already controlled 76% of the market prior to the merger.

68.     In *Brown Shoe vs. United States*, the Court enjoined a merger of the
number 3 firm with 6% of the market and the number 2 firm with 9.5% of the market
where the four largest firms controlled already 23% of the national market.

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and
Section 1 of the Sherman Act*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

69.    And in *United States v. Philadelphia National Bank*, in a market where, post-merger, the four largest banks would have controlled 78% of the market, the Court enjoined the merger of the number 2 and number 3 banks that would have given them 36% of the market.

70.    The Supreme Court encourages competition.

71.    Market concentration is an indication of the level of competition in a market. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition. The Herfindahl-Hirschman Index (HHI), is often widely employed in competition analysis to measure market concentration. HHI is calculated by summing the squared market shares of all firms in the given market which "gives proportionately greater weight to the larger market shares."[13] Analysis of market concentration "consider[s] both the post-merger level of the HHI and the increase in the HHI resulting from the merger."

72.    Markets in which the HHI exceeds 2,500 points are considered highly concentrated.  Post-merger increases in HHI of more than 200 points are <u>presumed</u> to likely enhance market power[14] and to be anticompetitive therefore a merger that increases the HHI by more than 200 points will "establish the [Plaintiffs'] prima facie case that a merger is anticompetitive."[15]

73.    The national wireless communication service provider market is already highly concentrated, with a current HHI concentration measure of 2,899.[16]  Post-merger, the HHI of the national wireless communication service provider market would increase by 443 HHI points to a post-merger concentration level of 3,342 HHI.[17]

---

[13] *St. Alphonsus*, 778 F.3d at 786.

[14] *St. Alphonsus*, 778 F.3d at 786.

[15] *St. Alphonsus*, 778 F.3d at 786, citing *FTC v. H.J. Heinz Co.,* 246 F.3d 708, 716 (D.C. Cir. 2001).

[16] Based on the market percentage figures showing total connections for national base mobile wireless service providers set out in the FCC Communications Marketplace Report at p. 8 - excluding regional carrier U.S. Cellular.  These figures are included above in Figure A-3.

[17] Based on figures from the FCC Communications Marketplace Report at p. 8, excluding regional carrier U.S. Cellular; see also, https://www.antitrustinstitute.org/wp-content/uploads/2018/08/AAI_Sprint-T-Mobile_Comm_6.5.18.pdf, at p. 4 ("The merger would boost concentration by almost 500 HHI points, about 3,250 HHI in the post-merger market.  The Guidelines explain that 'Mergers resulting in highly concentrated markets that involve an increase in HHI of more than 200 points will be presumed likely to enhance market

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1
2
3

A Sprint-T-Mobile merger therefore will result in concentration levels that far exceed the upper redline threshold for anticompetitive market dominance and therefore is presumptively illegal.

4
5
6
7
8

74.    In addition, T-MOBILE's elimination of SPRINT will be virtually certain to cause substantial irreparable injury to Plaintiffs and to all consumers for domestic wireless services in the relevant geographic and product markets in that, among other reasons, SPRINT, and the consumer choices that go with it, will be gone, and once gone, the harm would be irreparable.

9
10
11
12
13
14
15
16
17
18

75.    Plaintiffs are threatened with the loss of (1) the distinctive services and experience offered by SPRINT; (2) a reduction in customer choice; (3) a reduction in capacity and the curtailment of service thereby creating higher prices and severe inconvenience to consumers; (4) the loss of the only carrier currently headquartered in Kansas with the substitution of an absentee owner and operator; and (5) ultimately the loss of a vibrant, vigorous and innovative competitor.  The elimination of SPRINT will further reduce the number of wireless carriers servicing the U.S. market, and in so doing, substantially threatens to harm U.S. consumers through increases in rates, translating to billions of dollars of harm to consumers annually, and further threatens to deprive consumers of the unique affordability, service and experience offered by SPRINT.

19
20
21
22
23
24
25

76.    If SPRINT is eliminated, Plaintiffs will sustain irreparable harm for which damages will be inadequate to compensate Plaintiffs in that the competition from a "price-disruptor" will be extirpated and customer choice for travel options eradicated.  The imagination and initiative of SPRINT will be snuffed-out; modern technology innovation and expansion plans will be jettisoned; customer convenience and satisfaction will be disregarded.  SPRINT'S wireless service once lost cannot be restored.

26
27

77.    In addition, T-MOBILE's merger (1) threatens to derail SPRINT'S proposed expansion into markets, with a concomitant loss of jobs there; (2) threatens to

28

power.'  A Sprint-T-Mobile merger will result in concentrations that exceed this upper threshold by an order of magnitude.")

- 21 -
*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

derail SPRINT'S planned merger of additional capital improvements, thereby lessening the possibility of substantial innovation in the industry; and (3) threatens to substantially reduce the work force of the two wireless carriers through employee layoffs due to the elimination of competition due to the merger.

78.     Moreover, the industry's existing barriers to entry will effectively preclude the introduction of a new wireless carrier, there will likely be no new startup entrants into the wireless market because new entrants would face significant barriers to success, including difficulty in obtaining access to networks; difficulty in competing with the effects of corporate discount programs offered by dominant incumbents; difficulty due to customer loyalty to existing carriers; difficulty of promoting an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carriers.

79.     Since the prospect of a new start-up entry is unlikely, the entry of new competitors in the marketplace cannot serve as a basis to mitigate the anticompetitive effects that may result from T-MOBILE'S proposed merger.

80.     T-MOBILE as an existing wireless carrier, however, has the wherewithal, experience, financial ability, intent, and expertise to compete in the very markets and areas it seeks to gain by its elimination of SPRINT. Such an entry by T-MOBILE into new markets would serve to increase competition, create new jobs, lower rates, increase capacity, increase availability, and enhance consumer choice. The elimination of SPRINT would do exactly the opposite.

81.     Both T-Mobile and Sprint are strong, vigorous and viable actual and potential competitors and each is and has been ready, willing and able to compete against the other for market share, including against the two major cellular carriers. Neither are failing companies.

82.     Sprint's 2018 revenues from wireless services were approximately $23 billion. As of March 31, 2019, Sprint employed approximately 28,500 people.  For the year ended March 31, 2018, Sprint posted $7.4 billion in net income.

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

83.     Since 2010, T-Mobile has more than doubled its total subscriber base, growing from approximately 33 million subscribers in 2010 to nearly 80 million subscribers at the end of 2018.   T-Mobile provides mobile wireless telecommunications services in all 50 states. In 2018, T-Mobile's revenues were $43.3 billion. As of December 31, 2018, T-Mobile employed approximately 52,000 full-time and part-time employees.

84.     As a result, there simply is no competitive need to eliminate Sprint as a competitor.  To the contrary, the continued vigorous competition of Sprint is one of the few, if not the principal, remaining competitive forces in the market. Its continued existence in the market is needed to preserve and protect the minimal amount of competition that exists in the cellular industry today.  Indeed, if there is to be any restoration of competition in the cellular industry, Sprint and T-Mobile is the companies that are poised to cause it.

85.     Various of the States Attorneys General have sued T-Mobile and Sprint to prevent this merger from being consummated.  Intense political pressure is now being exerted to induce these states to drop their lawsuits, and some states have already capitulated to this pressure.  In a full-page advertisement in the New York Times published on Sunday, November 17, 2019, T-Mobile blatantly sought to bribe the state governments by offering free services, while alternately threatening the states attorney generals by charging them with obstructing innovation and progress: "But if they [States Attorney Generals] ultimately can't see the value we'll deliver, consumers will lose.  America will lose.  They need to join the fight for U.S. wireless consumers rather than stand in the way."

86.     In fact, the exact opposite is true.  Only competition can spur the innovation that will advance our technological progress as a nation.  And since it is the consumers who will be affected by this merger and who therefore must be represented, it has been necessary for these consumers to file this action to ensure that their voices may be raised to protect the interests of consumers in those states where no lawsuits

have been filed as well those consumers in states whose attorneys general have filed lawsuits that are being litigated.

87.     Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against Defendants' proposed elimination of SPRINT and seek an order prohibiting T-MOBILE and SPRINT from merging.

VIOLATIONS ALLEGED

Clayton Act, Section 7, 15 U.S.C. § 18

88.     The effect of the proposed merger may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

89.     Unless enjoined, the proposed merger may, and most probably would, have the following potential effects in the relevant markets, among others:

(a) actual and potential competition between T-MOBILE and SPRINT may be eliminated;

(b) competition in general among other wireless carriers in the United States may be lessened substantially;

(c) wireless rates and ancillary fees may be higher than they otherwise would be;

(d) industry capacity may be lower than it otherwise would be; and

(e) service may be lessened.

90.     By reason of this violation, the Plaintiffs are threatened with loss or damage in the form of potentially higher rates and diminished service, the potential elimination of a favored wireless carrier as an alternative to the major carriers, as well as additional irreparable harm for which damages will be inadequate to compensate Plaintiffs.   Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed merger, and to recover their costs of suit, including a reasonable attorney's fee.

<u>Sherman Act, Section 1, 15 U.S.C. § 1</u>

91.     The contract to acquire SPRINT is a contract in unreasonable restraint of trade and unenforceable because it eliminates a significant rival wireless carrier in a non-trivial transaction. The elimination of competition by agreement between significant rivals, neither one of which is a "failing company" and both of which are vibrant, efficient, experienced, and financially able, affecting interstate commerce, is unlawful, against the public policy of the United States, and ipso facto null and void. As a contract in unreasonable restraint of trade it therefore is a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

92.     Unless enjoined, the elimination of SPRINT may have the following potential effects in the relevant markets, among others:

(a) actual and potential competition between SPRINT and T-MOBILE may be eliminated;

(b) actual and potential competition between SPRINT and other wireless carriers may be eliminated;

(c) competition in general among other wireless carriers may be substantially lessened;

(d) SPRINT may be foreclosed from a significant market;

(e) wireless rates and ancillary fees may be higher than they otherwise would be;

(f) industry capacity may be lower than it otherwise would be; and

(g) service may be lessened.

93.     By reason of this violation, the Plaintiffs are threatened with loss or damage in the form of higher wireless rates and diminished service, as well as irreparable harm for which damages will be inadequate to compensate Plaintiffs. Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this merger, and to recover their costs of suit, including a reasonable attorney's fee.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief from this Honorable Court:

A.    Declaring, finding, adjudging and decreeing that the agreement of T-MOBILE to acquire SPRINT violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

B.    Declaring, finding, adjudging and decreeing that the contract between T-MOBILE and SPRINT to eliminate SPRINT as a competitor violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    Preliminarily enjoining T-MOBILE from consummating the merger of SPRINT, or, if necessary, ordering divestiture of the merger or requiring divestiture.

E.    Declaring the contract between the T-MOBILE and SPRINT to be null and void and against the public policy of the United States which declares that competition rather than combination is the rule of trade in the United States;

F.    Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

G.    Granting to Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and proper.


Dated: November 25, 2019


By:    /s /Joseph M. Alioto
        Joseph M. Alioto (SBN 42680)
        Jamie L. Miller (SBN 271452)
        Thomas P. Pier (SBN 235740)
        ALIOTO LAW FIRM
        One Sansome Street, 35th Floor
        San Francisco, CA  94104
        Telephone: (415) 434-8900
        E-mail:  jmalioto@aliotolaw.com
                 jmiller@aliotolaw.com

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1

2

3    Lawrence G. Papale (SBN 67068)
     LAW OFFICES OF LAWRENCE G. PAPALE
4    1308 Main Street, Suite 117
     St. Helena, CA 94574
5    Telephone: (707) 963-1704
     Email: lgpapale@papalelaw.com
6

7    Christopher A. Nedeau (SBN 81297)
     NEDEAU LAW FIRM
8    750 Battery Street, 7th Floor
     San Francisco, CA 94111
9    Telephone: 415-516-4010
     Email: cnedeau@nedeaulaw.net
10

11   Josephine L. Alioto (SBN 282989)
     Anthony L. Label (SBN 205920)
12   THE VEEN FIRM, P.C.
     20 Haight Street
13   San Francisco, CA  94102
     Telephone:   415-673-4800
14   Email: j.alioto@veenfirm.com
     Email: a. label@veenfirm.com
15

16

17   COUNSEL FOR THE PLAINTIFFS

18

19

20

21

22

23

24

25

26

27

28

*Complaint to Prohibit the Merger of SPRINT by T-MOBILE in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

EXHIBIT A

**Federal Communications Commission**                              **FCC 18-181**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Communications Marketplace Report | ) | GN Docket No. 18-231 |
| | ) | |
| The State of Mobile Wireless Competition | ) | WT Docket No. 18-203 |
| | ) | |
| Status of Competition in the Market for the | ) | MB Docket No. 17-214 |
| Delivery of Video Programming | ) | |
| | ) | |
| Status of Competition in the Marketplace for | ) | MB Docket No. 18-227 |
| Delivery of Audio Programming | ) | |
| | ) | |
| Satellite Communications Services for the | ) | IB Docket No. 18-251 |
| Communications Marketplace Report | ) | |

**REPORT**

**Adopted:  December 12, 2018**                    **Released:  December 26, 2018**

By the Commission: Chairman Pai and Commissioners O'Rielly and Carr issuing separate statements;
Commissioner Rosenworcel concurring and issuing a statement.

**TABLE OF CONTENTS**

Para.

I.   INTRODUCTION ................................................................................................................ 1
II.  ASSESSMENT OF COMPETITION AND DEPLOYMENT .......................................... 4
     A.  The Mobile Wireless Market ...................................................................................... 5
         1.  Characteristics of the Mobile Wireless Industry ................................................. 6
         2.  Pricing Levels and Trends .................................................................................. 14
         3.  Non-Price Competition ...................................................................................... 23
         4.  Entry Conditions and Market Concentration ..................................................... 29
         5.  Mobile Wireless Spectrum ................................................................................. 31
         6.  Service Providers' Spectrum Holdings .............................................................. 33
         7.  Wireless Infrastructure ....................................................................................... 34
         8.  Network Coverage .............................................................................................. 37
     B.  The Video Market ...................................................................................................... 47
         1.  MVPDs ............................................................................................................... 50
         2.  OVDs .................................................................................................................. 76
         3.  Broadcast Television Stations ............................................................................ 90
         4.  Intermodal Competition ................................................................................... 114
         5.  Marketplace Factors Relevant to Entry, Competition, and Expansion............ 128
     C.  The Audio Market .................................................................................................... 137
         1.  Terrestrial Radio Broadcasters ........................................................................ 140
         2.  Satellite Radio .................................................................................................. 151
         3.  Online Audio Providers .................................................................................... 154

        4.  Intermodal Competition ............................................................................. 161
        5.  Marketplace Factors Relevant to Entry, Competition, and Expansion................... 167
    D.  The Fixed Broadband Market ................................................................................ 169
        1.  Overview of the Fixed Broadband Communications Marketplace ....................... 171
        2.  Fixed Broadband Competition Data..................................................................... 183
        3.  Regulatory and Market Barriers .......................................................................... 192
        4.  Investment Trends ................................................................................................ 200
    E.  Voice Telephone Services........................................................................................ 203
    F.  The Satellite Market................................................................................................ 208
        1.  Overview of the Commercial Satellite Services Industry ................................... 209
        2.  Satellite Revenues ............................................................................................... 215
        3.  Examination of Satellite Communications Services and Providers...................... 217
        4.  Recent Changes and Trends.................................................................................. 229
    G.  Broadband Deployment .......................................................................................... 236
        1.  Scope of Reporting............................................................................................... 238
        2.  Data Sources and Methodologies ......................................................................... 241
        3.  Broadband Deployment Estimates ....................................................................... 247
        4.  Demographic Data................................................................................................ 255
        5.  Tribal Lands Data ................................................................................................. 259
        6.  Adoption Data ...................................................................................................... 262
    H.  International Broadband Data Report ...................................................................... 265
        1.  Background ........................................................................................................... 266
        2.  Discussion ............................................................................................................ 267
III. COMMISSION ACTIONS ALREADY TAKEN TO CLOSE DIGITAL DIVIDE,
    ENHANCE COMPETITION, AND ENCOURAGE DEPLOYMENT OF
    COMMUNICATIONS SERVICES .............................................................................. 290
    A.  The Mobile Wireless Market .................................................................................. 291
        1.  Universal Support Challenges and Commission Actions...................................... 291
        2.  Spectrum Challenges and Commission Actions.................................................... 293
        3.  Wireless Infrastructure Siting Challenges and Commission Actions.................... 297
    B.  The Fixed Communications Market ......................................................................... 301
    C.  The Video and Audio Markets................................................................................. 313
    D.  The Satellite Market................................................................................................ 321
IV. COMMISSION AGENDA TO FURTHER ENCOURAGE INVESTMENT, INNOVATION,
    DEPLOYMENT, AND COMPETITION ...................................................................... 326
    A.  The Mobile Wireless Market .................................................................................. 327
    B.  The Fixed Communications Market ......................................................................... 335
    C.  The Video and Audio Markets................................................................................. 339
    D.  The Satellite Market................................................................................................ 344
V.  PROCEDURAL MATTERS ......................................................................................... 349

**I.      INTRODUCTION**

        1.      With this first *Communications Marketplace Report*, the Commission fulfills the
requirement set forth in RAY BAUM'S Act of 2018 to streamline its numerous and varied public reports
into a single document providing a comprehensive evaluation of the state of communications in the
United States.[1]  This *Report* consolidates the Commission's historical, statutorily required reports, all of
which had been issued in separate documents and at different times, and which assessed different aspects

---

[1] Section 401 of the Repack Airwaves Yielding Better Access for Users of Modern Services Act of 2018 (RAY
BAUM'S Act), Pub. L. No. 115-141, 132 Stat. 1087 (codified at 47 U.S.C. § 163) (RAY BAUM'S Act).

of the diverse communications technologies the Commission oversees.  For the first time, the *Report* places essential information about all of these technologies in one place.

2.      Title IV of RAY BAUM'S Act of 2018 directs the Commission to publish in the last quarter of every even-numbered year "a report on the state of the communications marketplace."[2]  Each biennial report must assess the state of all forms of competition in the communications marketplace; the state of deployment of communications capabilities; barriers to competitive entry, including market entry barriers for entrepreneurs and other small businesses; and must describe the actions taken by the Commission in the previous two years to address challenges and opportunities in the communications marketplace, and the Commission's agenda for continuing to address those challenges and opportunities over the next two years.  The Commission must also compile a list of geographic areas that are not served by any provider of advanced telecommunications capability.

3.      In addition to establishing the *Communications Marketplace Report* requirement, RAY BAUM'S Act of 2018 also expressly repealed and modified the Commission's requirement to produce many other reports.  The Media Bureau, Wireless Telecommunications Bureau, Wireline Competition Bureau, and International Bureau separately sought public comment to assist the Commission in fulfilling its reporting duties under the RAY BAUM'S Act of 2018.[3]  In total, RAY BAUM'S Act of 2018 eliminated or materially modified 10 separate regularly recurring Commission reports to Congress and in their place consolidated most of the data required by those reports into this single comprehensive report.[4]  The Commission's regulatory reach encompasses a number of different modes of communications.  The replacement of multiple separate reports on distinct schedules with a single consolidated *Communications Marketplace Report* provides greater transparency to the public, enables a more holistic examination of the state of the communications market across technologies, and simplifies for interested parties the ability to research, consider and evaluate our assessments.

## II.      ASSESSMENT OF COMPETITION AND DEPLOYMENT

4.      This section of the *Report* addresses the requirement that the Commission assess the state of competition in the communications marketplace, including a discussion of barriers to competitive entry, including market entry barriers for entrepreneurs and other small businesses.  We first discuss the state of competition in the mobile wireless market, including market characteristics, spectrum and pricing levels and trends.  We then discuss competition in the audio market, such as terrestrial and satellite radio, and in the video market, including broadcast, multichannel and online video services.  We next address the state of competition in the fixed broadband market, including investment trends and market barriers, as well as a discussion of the voice services market.  The *Report* next addresses the state of competition in the satellite market including industry providers and recent changes in the market.  We also assess in this section the state of deployment of communications capabilities as required by RAY BAUM'S Act.  We also provide comparative international data on broadband services, and, where possible, a year-to-year measure of the extent of broadband service capability, including speeds and prices, in the United States

---

[2] 47 U.S.C. § 163(a).

[3] *See Media Bureau Seeks Comment on the Status of Competition in the Marketplace for Delivery of Audio Programming*, Public Notice, MB Docket No. 18-227, DA 18-761 (rel. July 23, 2018); *Wireless Telecommunications Bureau Seeks Comment on The State of Mobile Wireless Competition,* WT Docket No. 18-203, Public Notice, DA-18-663, (WTB 2018) (*Mobile Wireless Competition PN*); *Wireline Competition Bureau Seeks Comment on The State of Fixed Broadband Competition*, GN Docket No. 18-231, Public Notice, DA 18-784 (WCB July 27, 2018); *International Bureau Seeks Comment on Satellite Communications Services for the Communications Marketplace Report*, IB Docket No. 18-251, Public Notice, DA 18-858 (IB Aug. 17, 2018) (*International Bureau Satellite Public Notice*).

[4] *See* RAY BAUM'S Act, section 402.  The Act also eliminates other, non-regularly recurring Commission reporting obligations to Congress.  *See id.*, section 402(i)(1)-(5).

and select communities and countries abroad.[5]  In addition, we include throughout this section data presentations related to the various markets and discussions of intermodal competition, also as required by RAY BAUM'S Act of 2018.

> ### A.      The Mobile Wireless Market

5.      Mobile wireless services are an important and increasingly prevalent part of Americans' daily lives, and competition in the provision of mobile wireless services drives innovation and investment to the ultimate benefit of the American people and economy.[6]  In this section, we present and review available 2017 data for all mobile wireless services, including voice, messaging, and broadband, and also present certain pricing information as of early 2018.[7]

> #### 1.      Characteristics of the Mobile Wireless Industry

> ##### a.      Service Providers[8]

6.      *Facilities-Based Service Providers.*  As of year-end 2017, there were four facilities-based mobile wireless service providers in the United States that are typically described as "nationwide": AT&T, Sprint, T-Mobile, and Verizon Wireless.  Although none of these four nationwide service providers has a network that is truly ubiquitous, all four service providers have networks that cover at least 90% of the population with Long Term Evolution (LTE).[9]  Therefore, this *Report* will refer to these four service providers as "nationwide service providers."  Collectively, these four service providers account for over 400 million connections.[10]  U.S. Cellular, currently the fifth largest facilities-based service provider in the United States, is best characterized as a multi-regional service provider, and has developed wireless networks and customer service operations in portions of 22 states.[11]  As of December

---

[5] 47 U.S.C. § 1303(b).  The Broadband Data Improvement Act, Pub. L. No. 110-385, 122 Stat. 4096 (2008), is codified in Title 47, Chapter 12 of the United States Code.  47 U.S.C. § 1301 *et seq.*

[6] The *Communications Marketplace Report* includes information in this section on the mobile wireless marketplace that previously was submitted to Congress as a separate *Mobile Wireless Competition Report* under Section 332(c)(1)(C) of the Communications Act of 1934, as amended (Communications Act).  47 U.S.C. § 332(c)(1)(C).  Section 332(c)(1)(C) was amended by striking the first and second sentences, which read: "The Commission shall review competitive market conditions with respect to commercial mobile services and shall include in its annual report an analysis of those conditions.  Such analysis shall include an identification of the number of competitors in various commercial mobile services, an analysis of whether or not there is effective competition, an analysis of whether any of such competitors have a dominant share of the market for such services, and a statement of whether additional providers or classes of providers in those services would be likely to enhance competition."  *Id.*

[7] Our analysis in this section is data-centric; it combines discussions with substantial use of figures in accessible data formats.  For additional coverage maps, *see* the web appendix.  FCC, Coverage Map Appendix.  Citations to Comments in this section refer to filings submitted in response to the *Mobile Wireless Competition PN.*

[8] We note that mobile satellite service providers offer satellite-based communications to mobile devices, and generally are targeted at users who require communications and asset tracking in remote areas, in disaster response situations, or other places where terrestrial mobile wireless network access may be limited.  In addition, narrowband data service providers offer services including two-way messaging, as well as machine-to-machine (M2M) and other telemetry communications, and are consumed primarily by businesses, government users, and other institutions.  *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, WT Docket No. 17-126, Twentieth Report, 32 FCC Rcd 8968, 8977, paras. 17-18 (2017) (*Twentieth Report*).

[9] *See infra* Section II.A.8.

[10] *See infra* Figure A-1.

[11] United States Cellular Corp., 2017 SEC Form 10-K, at 1 (filed Feb. 26, 2018), https://www.sec.gov/Archives/edgar/data/821130/000082113018000008/usm10k.htm.  U.S. Cellular is a majority-owned (83%) subsidiary of Telephone and Data Systems, Inc.  *Id.*  Unless otherwise noted, all websites cited in this

(continued….)

31, 2017, U.S. Cellular accounted for approximately five million connections.[12]  C Spire, the sixth largest service provider in the U.S., provides service in the Southeastern United States to nearly one million subscribers.[13]  There are also dozens of other facilities-based mobile wireless service providers throughout the United States, many of which provide service in a single, often rural, geographic area.[14]  These non-nationwide service providers increase choice for consumers and help to promote deployment in rural areas.[15]

7.      *Mobile Virtual Network Operator (MVNOs).*  MVNOs do not own any network facilities, but instead purchase mobile wireless services wholesale from facilities-based service providers and resell these services to consumers.[16]  In 2017, TracFone Wireless (TracFone), an America Movil subsidiary, was the largest MVNO, with approximately 23 million subscribers.[17]  In 2015, Google launched "Project Fi," an MVNO in partnership with T-Mobile and Sprint whereby Google Fi subscribers switch between Wi-Fi networks and these two service providers' LTE networks.[18]  In 2016, both Comcast,[19] and Charter Communications,[20] the nation's two largest cable providers, activated MVNO options they held with Verizon Wireless.  Comcast launched its wireless service in the spring of 2017 as Xfinity Mobile and had

(Continued from previous page)  ───────────────
*Report* were visited between Nov. 21, 2018, and Dec. 10, 2018, in order to confirm the accuracy of the information contained therein.

[12] *Id.*

[13] C Spire, About C Spire, https://www.cspire.com/company_info/about/news_detail.jsp?entryId=29600003.

[14] Examples of regional facilities-based service providers include Appalachian Wireless, Bluegrass Cellular, Carolina West Wireless, Cellcom, Choice Wireless, GCI, Nex-Tech Wireless, and Sagebrush Cellular.  *Twentieth Report*, 32 FCC Rcd at 8975, para. 14 & n.50.

[15] *Policies Regarding Mobile Spectrum Holdings Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, Report and Order, 29 FCC Rcd 6133, 6207, paras. 179-80 (2014) (*Mobile Spectrum Holdings Report and Order*).

[16] *Twentieth Report*, 32 FCC Rcd at 8976, para. 15. The Commission is not able to provide an exact figure of the number of MVNOs that currently offer services.  This is partly because, as resellers of service offered by facilities-based service providers, MVNOs are not licensees and typically do not file Section 214 applications.  Furthermore, as the Commission has found in prior competition reports, "[c]omprehensive data on MVNO subscribers are generally not reported by either MVNOs or facilities-based providers that host MVNOs.  Estimates of the number of MVNOs operating in the United States vary considerably.  Many MVNOs are privately-held companies that do not publicly report financial or subscriber data."  *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Sixteenth Report, 28 FCC Rcd 3700, 3739, para. 32 (2013) (*Sixteenth Report*).

[17] TracFone, TracFone Home, http://www.tracfone.com/; Prepaid Phone News, Fourth Quarter, 2017 Prepaid Mobile Subscriber Numbers by Operator (Feb. 19, 2018), https://www.prepaidphonenews.com/2018/02/fourth-quarter-2017-prepaid-mobile.html.

[18] FierceWireless, Google Unveils "Project Fi" MVNO with Sprint and T-Mobile as Partners (Apr. 22, 2015), http://www.fiercewireless.com/story/google-unveils-project-fi-mvno-sprint-and-t-mobile-partners/2015-04-22.  In June 2016, Google added U.S. Cellular as a partner.  FierceWireless, Google's Project Fi to Add U.S. Cellular to Partner Network (June 8, 2016), http://www.fiercewireless.com/story/googles-project-fi-add-us-cellular-partner-network/2016-06-08.  Similar WiFi service is also provided by two other MVNOs - FreedomPop (https://www.freedompop.com/) and Republic Wireless (https://republicwireless.com/faqs/).

[19] FierceWireless, Comcast to Launch Wireless Service in 2017 with Verizon MVNO, 15M Wi-Fi Hotspots (Sept. 20, 2016), http://www.fiercewireless.com/wireless/comcast-to-launch-wireless-service-2017-verizon-mvno-15m-wi-fi-hotspots.

[20] FierceCable, Rutledge: Charter Has Asked Verizon to Activate MVNO Agreement (Sept. 21, 2016), http://www.fiercecable.com/cable/rutledge-charter-has-asked-verizon-to-activate-mvno-agreement.

approximately 380,000 subscribers at year-end 2017.[21]  Charter began offering its service in the summer of 2018.[22]

### b.    Connections/Subscribers

8.      To estimate the number of mobile wireless subscribers/connections,[23] this *Report* uses Numbering Resource Utilization Forecast (NRUF) data, which tracks the quantity of phone numbers that have been assigned to mobile wireless devices,[24] CTIA data, and UBS data.  As shown in Figure A-1 below,[25] the number of mobile wireless connections, based on NRUF, grew by approximately 3% from year-end 2016 to year-end 2017 to approximately 411 million, while CTIA estimates of mobile wireless connections grew to approximately 400 million, an increase of approximately 1%.  Figure A-2 presents data on total connections by service segment based on UBS data.  It shows that, in 2017, the postpaid segment accounted for more than 60% of all connections, while the prepaid segment accounted for less than 20% of all connections, and wholesale connections and connected devices accounted for the remainder. [27]

9.      Figure A-3 presents data on total mobile wireless connections for the largest publicly-traded service providers operating in the United States, including an estimate of their respective market shares for 2017.[28]  In addition, when measuring market share in terms of revenue, in 2017, Verizon Wireless's market share was 35.5%, compared to 32.4% for AT&T, 17% for T-Mobile, and 12.8% for Sprint.[29]

---

[21] FireceWireless, Comcast's Xfinity Mobile MVNO Grows to 380,000 Customer Lines in Less than 1 Year (Jan. 24, 2018) https://www.fiercewireless.com/wireless/comcast-s-xfinity-mobile-mvno-grows-to-380-000-customer-lines-less-than-1-year.

[22] Charter Communications NewsRoom, Introducing Spectrum Mobile (June 30, 2018) https://newsroom.charter.com/news-views/introducing-spectrum-mobile/.

[23] Different sources refer to their data as connections or subscribers, and when discussing the different data, we will use the terminology most currently used by the source and, where possible, provide a definition of this term.  For example, CTIA explains its use of the terms "subscribers" and "connections" as follows: "'Subscribers' is used as a term of art, and reflects the number of revenue-generating units, equally describable as 'wireless connections' – the equivalent of wireline 'lines.'  The terms 'subscriber' and 'subscribership' do not denote unique individual subscribers."  CTIA Wireless Industry Indices Year-End 2017, at 16.

[24] NRUF provides a measure of the number of mobile wireless connections or connected devices that have assigned telephone numbers.  As the number of mobile wireless devices that lack telephone numbers increases, the NRUF data will become less accurate.

[25] For details of total mobile wireless connections over time, *see* Appendix A-1: Total Mobile Wireless Connections.

[26] We have estimated penetration rates (the number of mobile wireless connections per 100 people), using NRUF for the 172 Economic Areas (EAs) in the United States.  Our estimates suggest that 2017 regional penetration rates range from 99.9% in Salisbury, MD-DE-VA to 204% in Biloxi-Gulfport-Pascagoula, MS.  Note that NRUF-based penetration rates can exceed 100% because NRUF identifies the number of connected devices that have associated telephone numbers, and a single subscriber may have multiple connected devices.  *See* Appendix A-2: Penetration Rates by EA.

[27] Connected devices are primarily mobile, non-voice devices, including (but not limited to) Internet access devices (e.g., wireless modem cards and mobile Wi-Fi hotspots), tablets, e-readers, smart watches, and telematics systems.

[28] The size of a company, typically measured by service revenues or subscribers, relative to the total size of the industry determines its market share.  *See* The MIT Dictionary of Modern Economics, at 268 (4th ed. 1992).

[29] Based on UBS data, Verizon Wireless's service revenues were $63.1 billion, compared to $57.7 billion for AT&T, $30.2 billion, for T-Mobile, and $22.7 billion for Sprint.  For previous years, *see Twentieth Report*, 32 FCC Rcd at 8987-88, para. 32 and Table II.C.1.  In 2017, total wireless service revenues were approximately $179 billion, a year-over-year decrease of $9.4 billion (or approximately 5%).  CTIA Wireless Industry Indices Year-End 2017, at 58.



| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| **NRUF** | 357.1 | 378.2 | 398.4 | 410.7 |
| **CTIA** | 355.4 | 377.9 | 395.9 | 400.2 |

Source: NRUF, CTIA Wireless Industry Indices Year-End 2017.



Source: UBS Investment Research.  UBS US Wireless 411, Version 51, Figure 17; UBS US Wireless 411, Version 59, Figure 42; UBS Wireless 411, Feb. 2017, Figure 25; UBS Data 2017.

7

**Federal Communications Commission**                              **FCC 18-181**

**Fig. A-3**
**Estimated Total Connections for Publicly Traded Facilities–Based Mobile**
**Wireless Service Providers (in thousands): 2014–2017**

| Service Providers | EOY 2014 | EOY 2015 | EOY 2016 | EOY 2017 | EOY 2017 (% Market Share) |
|---|---|---|---|---|---|
| Verizon Wireless | 134,612 | 140,924 | 145,859 | 151,978 | 35.1 |
| AT&T | 120,620 | 128,679 | 134,875 | 146,847 | 33.9 |
| T-Mobile | 55,018 | 63,282 | 71,455 | 74,040 | 17.1 |
| Sprint | 55,929 | 58,578 | 59,515 | 54,683 | 12.6 |
| U.S. Cellular | 4,760 | 4,876 | 5,079 | 5,063 | 1.2 |
| Top 5 Service Providers Total | 370,939 | 396,339 | 416,783 | 432,611 | |

Source: UBS US Wireless 411, Version 51, Table 21; Version 59, Figure 53; UBS Wireless 411, Feb. 2017, Figure 33; and UBS Data 2017.  Total estimated connections figure includes data only for the service providers reported in this table.

10.      Estimates of the number of net additions in 2017 vary.  As shown in Figure A-4, for 2017, there were approximately 12 million net additions based on NRUF data, compared with 4 million based on CTIA data.  Preliminary mobile voice subscriber data as reported by service providers on Form 477 show that for 2017, net subscriber additions totaled approximately 2 million.[30]  Figure A-5 below shows that postpaid net additions increased in 2017, and that the net number of connected device additions was consistently higher than prepaid additions, from 2014 through 2017.  Figure A-6, based on UBS data, shows net subscriber additions by the four nationwide service providers from 2014 through 2017.

---

[30] Based on Form 477, the preliminary total number of mobile voice telephone subscriptions at year-end 2017 was 340.1 million, as compared to 338.2 million at year-end 2016.  We again note that the year-end Form 477 data reported here are preliminary only, and are subject to corrections as appropriate by the service provider.  The final data will be published in due course by the agency.  *See, e.g.*, FCC, Wireline Competition Bureau, Voice Telephone Services: Status as of December 31, 2016 (Feb. 2018).  https://www.fcc.gov/voice-telephone-services-report.  These data do not include non-voice devices.

**Federal Communications Commission** **FCC 18-181**



Source: NRUF, CTIA Wireless Industry Indices Year-End 2017, Form 477.



| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Total | 23,475 | 25,396 | 21,476 | 17,039 |
| Connected | 6,966 | 8,211 | 8,578 | 11,150 |
| Wholesale | 2,465 | 4,466 | 3,838 | -5,215 |
| Prepaid | 853 | 1,136 | 1,750 | -685 |
| Postpaid | 13,191 | 11,401 | 7,310 | 11,789 |

Source: UBS Investment Research.  UBS US Wireless 411, V. 59, Figure 42; UBS US Wireless 411, Feb. 2017, Figure 25; and UBS Data 2017.

**Federal Communications Commission** **FCC 18-181**



Fig. A–6
Annual Net Additions by Service Provider: 2014–2017

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| ■Verizon | 9,235 | 6,276 | 4,955 | 5,222 |
| ■AT&T | 5,608 | 8,059 | 6,196 | 9,474 |
| ■Sprint | 575 | 2,649 | 2,411 | 1,173 |
| ■T-Mobile | 8,334 | 8,264 | 8,173 | 5,658 |

Source: UBS Investment Research.  UBS US Wireless 411, Version 51, Figure 14; UBS US Wireless 411, Version 59, Figure 62; UBS Wireless 411 Feb. 2017, Figure 35; and UBS Data 2017.

### c.    Churn

11.    Churn measures the percentage of connections that are disconnected from mobile wireless service during a given time period.[31]  A service provider's churn rate depends on many factors, such as the distribution of its customers between postpaid and prepaid service plans, customer satisfaction with their service provider, and switching costs.[32]  High levels of industry churn can indicate that consumers are not only willing but are also able to switch easily between service providers.  For 2017, CTIA reported an annual industry-wide churn rate of 15.9%, and a monthly rate of 1.3%.[33]  Figure A-7 shows the churn rates for the four nationwide providers by quarter.

---

[31] Churn is calculated by dividing the aggregate number of wireless subscriber connections who canceled service during a time period by the total number of wireless subscriber connections at the beginning of that time period.  For an annual calculation, if a service provider has an average monthly churn rate of 2%, the service provider would lose 24% of its subscribers over the course of a year.  Service providers publish their monthly churn rate information as part of their quarterly filings with the SEC.

[32] *Twentieth Report*, 32 FCC Rcd at 8984, para. 26; *Sixteenth Report*, 28 FCC Rcd at 3865, para. 260.

[33] CTIA Wireless Industry Indices Year-End 2017, at 35.  For prepaid services, CTIA reported an annual industry-wide churn rate of 48.3% and a monthly churn rate of 4%.  *Id*. at Appendix C, 12.

**Federal Communications Commission**                    **FCC 18-181**



**Fig. A-7**
**Quarterly Churn Rate for Nationwide Mobile Wireless Providers**
**1st Quarter 2014- 4th Quarter 2017**

|  | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 | 1Q16 | 2Q16 | 3Q16 | 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T | 1.4% | 1.5% | 1.4% | 1.6% | 1.4% | 1.3% | 1.3% | 1.5% | 1.4% | 1.4% | 1.5% | 1.7% | 1.5% | 1.3% | 1.3% | 1.4% |
| Verizon Wireless | 1.2% | 1.2% | 1.3% | 1.4% | 1.3% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.3% | 1.3% | 1.4% | 1.2% | 1.2% | 1.2% |
| Sprint | 3.2% | 2.4% | 2.3% | 2.4% | 2.1% | 2.3% | 2.2% | 2.5% | 2.3% | 2.1% | 2.1% | 2.2% | 1.9% | 1.9% | 2.0% | 1.8% |
| T-Mobile | 2.6% | 2.1% | 2.2% | 2.5% | 2.0% | 2.0% | 1.9% | 1.9% | 1.7% | 1.7% | 1.7% | 1.7% | 1.7% | 1.7% | 2.0% | 1.8% |

Source: UBS Investment Research.  UBS US Wireless 411, Version 49, Table 16.  UBS US Wireless 411, Version 51, Figure 28.  UBS US Wireless 411, Version 59, Figure 60; UBS US Wireless 411 Feb. 2017, Figure 35; and UBS Data 2017.

### d.    Data Usage

12.     As shown in Figure A-8, monthly data usage per smartphone subscriber rose to an average of 5.1 GB per subscriber per month, an increase of approximately 31% from year-end 2016 to year-end 2017.[34]  Figure A-9 shows that there was a corresponding drop in total annual minutes of voice use (MOUs) of approximately 21%,[35] and in total messaging traffic of approximately 9%.[36]

---

[34] *Id.* at 64, Chart 27.

[35] *Id.* at 60.

[36] *Id.* at 67.  This provider-reported messaging traffic does not include traffic from over-the-top messaging applications and services, which would only appear in the total data traffic figures, thereby contributing to the total MB of data traffic.  *Id.* at 13.

**Federal Communications Commission**                    **FCC 18-181**



Source: CTIA Wireless Industry Indices Year-End 2017, at 64, Chart 27.



Source: CTIA Wireless Industry Indices Year-End 2017, at 68, Chart 31.

13.     According to a Pew survey, by the end of 2017, smartphone and tablet ownership were 77% and 53%, respectively, up from 51% and 31%, in 2012.[37]  As of January 2018, Pew reported that one in five American adults are "smartphone-only" Internet users—they own a smartphone, but do not have traditional fixed home broadband service.[38]  U.S. Census Bureau's American Community Survey found that as of 2017, 11% percent of total U.S. households subscribed to a cellular data plan with no other type of Internet subscription.[39]  According to preliminary data from the Centers for Disease Control and Prevention (CDC), from December 2014 to December 2017, the percentage of U.S. households that were

---

[37] Pew Research Center, Mobile Fact Sheet (Feb. 5, 2018), http://www.pewinternet.org/fact-sheet/mobile/.

[38] *Id.*

[39] U.S. Census, 2017 American Community Survey 1-Year Estimates, Types of Computers and Internet Subscriptions, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

identified as wireless-only (no landline telephone service) increased from approximately 45% to approximately 54%.[40]

### 2.    Pricing Levels and Trends

14.    The following discussion focuses on pricing developments and changes during the period covered by this *Report*.  We note first that mobile service providers offer nationwide pricing plans throughout their service areas, with little disparity in monthly recurring charges between rural and non-rural markets.[41]  The majority of mobile wireless subscribers in the United States are billed monthly, after service has been provided (postpaid service), while others pay for services in advance of receiving them (prepaid service).[42]

### a.    Postpaid Service

15.    In 2017, service providers continued the trend of offering unlimited data plans,[43] with major providers adding tiers to their unlimited data plans.[44]  Providers also continued not to count certain types of data towards deprioritization and data limits (T-Mobile's "Binge On" program, for example).[45]  Not only did service providers compete in pricing, they also competed to offer the best combination of features with their unlimited plans.[46]  Verizon Wireless, for example, introduced two new unlimited plans in August 2017, Go Unlimited and Beyond Unlimited.[47]  In February 2018, U.S. Cellular offered four

---

[40] CDC, NCHS, Stephen J. Blumberg and Julian V. Luke, Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, July-December 2017, National Center for Health Statistics (June 2018), https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201806.pdf.

[41] *Twentieth Report*, 32 FCC Rcd at 9002, para. 48; *Sixteenth Report*, 28 FCC Rcd at 3797, para. 137.

[42] The prepaid and postpaid versions of a given pricing plan or promotion still differ somewhat, largely because prepaid subscribers may lack the credit background or income necessary to qualify for postpaid service.  To prevent credit losses and mitigate the credit risk associated with the prepaid segment, service providers require advance payment for both prepaid service and handsets.  *Twentieth Report*, 32 FCC Rcd at 9005-06, para. 56.

[43] While a majority of unlimited plans are offered to postpaid subscribers, some providers now also offer unlimited to their prepaid subscribers.

[44] Postpaid subscribers who use up their plan's data allowance in a given month generally experience data deprioritization only during network congestion.  *See, e.g.*, Sprint, Sprint Unlimited Data, Talk and Text Cell Phone Plans, https://www.sprint.com/landings/unlimited-cell-phone-plans/?id16=unlimited%20Freedom%20%7CAll&question_box=unlimited%20Freedom%20%7CAll; Verizon Wireless, Above Unlimited FAQs, https://www.verizonwireless.com/support/above-unlimited-faqs/.  AT&T, on their Mobile Share Plus plans, offers zero overages, as well as "Rollover Data," which allows its postpaid subscribers to roll over their unused data at no additional cost.  AT&T, Mobile Share Flex Pans, https://www.att.com/shop/wireless/data-plans.html; AT&T, Rollover Data, https://www.att.com/shop/wireless/rollover-data.html.

[45] *Twentieth Report*, 32 FCC Rcd at 9004, para. 52.

[46] AT&T Comments at 8.

[47] Verizon Wireless, Verizon Unlimited (Aug. 22, 2017), https://www.verizon.com/about/news/verizon-unlimited.  The Go Unlimited plan offers DVD-quality streaming and hotspot speeds of 600 Kbps for $75 (1 line) per month, while Beyond Unlimited includes HD-quality streaming and mobile hotspot with up to 15 GB for $85 (1 line) per month.  The terms of service of Verizon Wireless's Unlimited Plans indicate that data may be temporarily slower during any time of congestion with the GO Unlimited plan, and may decrease in times of congestion, after 22 GB of data has been used with Beyond Unlimited.  See, e.g., Verizon Wireless, Go Unlimited FAQs, https://www.verizonwireless.com/support/go-unlimited-faqs/; Verizon Wireless, Beyond Unlimited FAQs, https://www.verizonwireless.com/support/beyond-unlimited-faqs/.

lines with unlimited data for $35 each.[48]  Verizon Wireless added a new data plan called Above Unlimited in June 2018, that allows customers to mix and match different unlimited plans, and it includes 75 GB of LTE data, along with HD video streaming for $95 (1 line) per month.[49]  Later that month, AT&T launched two new top-tier unlimited data offerings, Unlimited & More for $70 for a single line, and Unlimited & More Premium for $80 for a single line (the latter includes its new WatchTV streaming video service).[50]  In July 2018, Sprint introduced two new unlimited plans: its top-tier plan, Unlimited Plus, offers 1080p video streaming, 15 GB of personal hotspot data, subscriptions to Hulu and Tidal for $70 per month for one line of service, while Unlimited Basic streams video at 480p resolution, includes 500 MB of personal hotspot service, and subscriptions to Hulu for $60 per month for one line of service.[51]  In contrast, T-Mobile introduced a less expensive unlimited plan in August 2018, Essentials, which starts at $60 for the first line and includes unlimited talk, text and smartphone data.[52]

### b.    Prepaid Service

16.    The four nationwide service providers also offer prepaid service under their own prepaid brands, in addition to selling customers to mobile wireless service wholesale to MVNOs, which then resell service on the nationwide networks under a variety of prepaid brands.  Verizon Wireless has the smallest share of prepaid subscribers among the nationwide service providers, with only one prepaid brand, Verizon Wireless Prepaid.  To varying degrees, the other three nationwide service providers pursue a multi-brand prepaid strategy.[53]  TracFone, the largest MVNO reseller, also has multiple prepaid brands, including Straight Talk, telcel, and SafeLink, which target different market and demographic segments such as premium, Hispanic, or low-income subscribers.[54]

17.    As postpaid offerings have shifted away from term contracts and equipment subsidies, service providers have adopted pricing plans and promotions for their high-end prepaid monthly service offerings that are similar to their postpaid offerings.  For example, unlimited prepaid plans were first introduced in February 2017 by Sprint's Boost Mobile, and in October 2017, Boost Mobile offered a family plan of five lines with unlimited data for $100 a month to consumers who switched service.[55]  AT&T's Cricket offered new customers twelve months of unlimited data access, calls, texts and media

---

[48] U.S. Cellular, U.S. Cellular Offering Four Lines With Unlimited Data For $35 Each (Feb. 12, 2018), https://www.uscellular.com/press-room/2018/USCELLULAR-OFFERING-FOUR-LINES-WITH-UNLIMITED-DATA-FOR-35-DOLLARS-EACH.html.

[49] Verizon Wireless, Mix and match your unlimited plans (Jun. 14, 2018), https://www.verizon.com/about/news/mix-and-match-your-unlimited-plans.

[50] AT&T, AT&T Debuts "WatchTV" With 2 New Unlimited Wireless (Jun. 21, 2018), http://about.att.com/newsroom/watchtv_app_with_unlimited_wireless.html.

[51] Sprint, Sprint's Industry-Leading Unlimited Plans Just Got Even Better!  New Unlimited Plans Include Features Customers Love for the Best Price (Jul. 12, 2018), https://newsroom.sprint.com/sprints-industry-leading-unlimited-plans-just-got-even-better-new-unlimited-plans-include-features-customers-love-for-best-price.htm.

[52] T-Mobile, Introducing T-Mobile Essentials: Smartphone Freedom on a Great Network at the Right Price (Aug. 6, 2018), https://www.t-mobile.com/news/introducing-t-mobile-essentials.

[53] Sprint prepaid brands include Boost Mobile, Virgin Mobile, and Assurance Wireless (under the Assurance Wireless brand, Virgin Mobile provides service to Lifeline eligible subscribers and subscribers who have lost their Lifeline eligibility and retain Assurance Wireless retail service); AT&T prepaid brands include AT&T Prepaid and Cricket; and T-Mobile prepaid brands include MetroPCS).

[54] TracFone Wireless Inc., Brands, http://www.tracfonewirelessinc.com/en/brands/.

[55] Boost Mobile, Boost Mobile Offers Unsurpassed Value in Family Plans – Five Lines with Unlimited Gigs for $100 a Month and Free Phones (Oct. 25, 2017), http://newsroom.sprint.com/boost-mobile-offers-unsurpassed-value-in-family-plans-five-lines-with-unlimited-gigs-for-100-month-and-free-phones.htm.

messages in their Unlimited 2 Plan for $40 a month in February 2018.[56]  In April 2018, T-Mobile's MetroPCS offered new customers two months of unlimited data for free.[57]  Generally, prepaid subscribers who reach the limit of their high-speed data allowance in a given month may continue to use their handsets for data service on an unlimited basis, but at reduced speeds.[58]  For example, Cricket reduces data download speeds to a maximum of 128 Kbps after the customer's high-speed data allowance is used.[59]

### c.    Price Indicators for Mobile Wireless Services

18.    It is difficult to directly compare prices because providers offer a variety of plans, frequently under multipart pricing schemes, which also vary in non-price terms and features, such as the consequences of reaching usage limits.[60]  Figures A-10 and A-11 present monthly postpaid prices for the four nationwide service providers' standard and premium unlimited plans, including discounts for auto-pay, which are now common.[61]  Figure A-12 shows the current monthly prices for major prepaid service providers.  Premium plans tend to have higher thresholds of data usage before deprioritization, more 4G LTE hotspot data, increased streaming video quality, and increased international allowances compared with standard plans offered by the same provider.  Unlimited service is also the primary offering of prepaid plans, though postpaid users frequently are given priority over prepaid users on a given network during times of peak congestion.[62]  Further, the heaviest postpaid users may also experience deprioritized speeds during periods of peak network congestion after they have exceeded certain monthly data thresholds.[63]

---

[56] Cricket, Cricket Helps Make Your Tax Refund Go Further with Unlimited Data for Just $40/Month http://cricketwireless.mediaroom.com/cricket-helps-make-your-tax-refund-go-further-with-unlimited-data-for-just-40-month.

[57] T-Mobile, Switch to MetroPCS Today and get TWO Months Unlimited Data Free (Apr. 12, 2018), https://www.t-mobile.com/news/metropcs-two-months-free.

[58] *Twentieth Report*, 32 FCC Rcd at 9005, para. 55.

[59] Cricket Wireless, Mobile Broadband Information, https://www.cricketwireless.com/legal-info/mobile-broadband-information.html.

[60] It is therefore difficult to identify sources of information that track mobile wireless service prices in a comprehensive and consistent manner.  In addition, data on subscribership is not available at the plan level and any average price comparison implicitly assumes uniform subscribership of all plans.  *See, e.g.*, *Twentieth Report*, 32 FCC Rcd at 9006, para. 57; *Sixteenth Report*, 28 FCC Rcd at 3797, para. 137.  According to analysis by Recon Analytics, the cost per MB has fallen significantly over the past decade, from $1.37 per MB in 2007 to less than half a cent per MB in 2016.  FierceWireless, Industry Voices—Entner: Consumer 'Surplus' in Wireless Rises $192B in 2 Years (Aug. 14, 2017), http://www.fiercewireless.com/wireless/industry-voices-entner-consumer-surplus-wireless-rises-192b-2-years.

[61] In addition, T-Mobile incorporates taxes and fees into its advertised prices for its T-Mobile One plan.  As these fees vary by locality, there is no way to fully account for the differences in pricing in Figures A-10 and A-11.

[62] MetroPCS in its Terms and Conditions indicates that "[t]o differentiate the services we sell, at times and at locations where there are competing customer demands for network resources, we give the data traffic of customers who choose T-Mobile-branded services precedence over the data traffic of customers who choose non-T-Mobile-branded services such as Metro by T-Mobile." *See* https://www.metropcs.com/terms-conditions/terms-conditions-service.html.

[63] As noted above, the average consumer uses about 5 GB of data per month, and after a certain level of data consumption (between 20 and 50 GB depending on the provider), data may be deprioritized.  *See* Section II.A.1.d.

Federal Communications Commission                    FCC 18-181





Note: The prices for unlimited data plans in Figures A-10 and A-11 were taken from service providers' websites on September 1, 2018. Prices include any per line charges indicated by the service provider. Prices do not include any additional charges such as for equipment installment plans, insurance, international use, or mobile hotspots. If a service provider includes any such feature as part of its unlimited data plan without extra charge, the above price would include this feature. Further, the above prices do not include any one-time charges paid, such as activation fees and termination fees. Prices and the specifics of the plans are subject to change.

Federal Communications Commission                                          FCC 18-181



Note: The prices were taken from service providers' websites on September 1, 2018.  Prices include any
per line charges indicated by the service provider.  Prices and the specifics of the plans are subject to
change.

19.      *CPI.*  The Consumer Price Index (CPI) is a measure of the average change over time in
the prices paid by consumers for a fixed market basket of consumer goods and services.  As documented
in previous *Reports*, two different pricing indicators—the Wireless Telephone Services CPI,[64] and the
per-minute price of voice service—show that mobile wireless prices have declined significantly since the
mid-1990s.[65]  According to CPI data, the price (in constant dollars) of mobile wireless services has
continued to decline: from 2016 to 2017, the annual Wireless Telephone Services CPI decreased by 11%
while the overall CPI increased by 2%, and the broader Telephone Services CPI fell by 7%.[66]  Further,
from 2013 through 2017, the annual Wireless Telephone Services CPI decreased by approximately 17%
and the Telephone Services CPI decreased by approximately 10%, while the overall CPI increased by
approximately 5%.

20.      *Average Revenue Per Unit.*  Various measures of Average Revenue per Unit (ARPU) are
frequently used as a proxy for price, particularly in industries with multiple pricing plans and complex
rate structures, such as mobile wireless service.[67]  As shown in Figure A-13 below, which is based on

---

[64] All CPI figures were taken from BLS databases: Bureau of Labor Statistics, http://www.bls.gov.  The index used
in this analysis, the CPI for All Urban Consumers (CPI-U), represents about 87% of the total U.S. population.
Bureau of Labor Statistics, Consumer Price Index: Frequently Asked Questions, https://www.bls.gov/cpi/questions-
and-answers.htm.  The CPI category "Telephone Services" has two components: wireless telephone services and
landline telephone services.  Additional information can be found at Bureau of Labor Statistics, Consumer Price
Index: How the Consumer Price Index Measures Price Change for Telephone Services,
https://www.bls.gov/cpi/factsheets/telephone-services.htm.

[65] *See, e.g.*, *Twentieth Report*, 32 FCC Rcd at 9008, para. 58; *Sixteenth Report*, 28 FCC Rcd at 3875, 3877, para.
265, Table 38.

[66] For changes in the CPI over time, *see* Appendix A-3: CPI.

[67] *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and
Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile
Services*, Seventeenth Report, 29 FCC Rcd 15311, 15328, para. 35 & n.52 (WTB 2014) (*Seventeenth Report*);
Patrick McCloughan and Sean Lyons, *Accounting for ARPU: New evidence from international panel data*,
Telecommunications Policy 30, 521-32 (2006); Eun-A Park, Krishna Jayakar, *Competition between Standards and
the Prices of Mobile Telecommunication Services: Analysis of Panel Data*, TPRC 2015 (Aug. 15, 2015).

Federal Communications Commission                                   FCC 18-181

CTIA data, industry ARPU fell sharply during 2017 from $41.50 to $38.66, a decline of approximately 7%.[68]  Recent changes by service providers, such as the removal of overage charges, the move toward unlimited data plans, and Equipment Installment Plans (EIPs) have all contributed to the reported decline in ARPU.  Figure A-13 also shows subscribers/connections and ARPU for more than 20 years.[69]



**Fig. A-13**
**Total Wireless Subscribers, ARPU**
**1994 - 2017**

Source: Based on CTIA Wireless Industry Indices Year-End 2017.

21.      *Average Revenue Per Unit by Service Provider.*  Based on UBS estimates, as seen in Figure A-14, from the fourth quarter of 2014 to the fourth quarter of 2017, ARPU declined for all service providers, with the exception of T-Mobile:  AT&T's ARPU declined by approximately 19%; Sprint's ARPU declined by approximately 20%; Verizon Wireless's ARPU declined by approximately 23%; while T-Mobile's ARPU was virtually constant.  Industry ARPU declined by approximately 18% over this time period.

---

[68] CTIA reported an industry average measure of ARPU which is calculated "based on total reported wireless service revenues for the period, divided by the average reported subscriber units during the survey period."  CTIA Wireless Industry Indices Year-End 2017, at 8.

[69] For additional details on ARPUs from 1993 to 2017, *see* Appendix A-4: ARPU.

Federal Communications Commission                           FCC 18-181

**Fig. A-14**
**ARPU Estimates of Publicly Traded Facilities-Based Mobile Wireless Service Providers**
**4th Quarter 2014–4th Quarter 2017**

| Nationwide Providers | 4Q14 | 4Q15 | 4Q16 | 4Q17 |
|---|---|---|---|---|
| AT&T | $42.04 | $38.78 | $36.58 | $34.13 |
| Sprint | $40.44 | $35.54 | $32.03 | $32.49 |
| T-Mobile | $35.56 | $34.53 | $33.80 | $35.62 |
| Verizon Wireless | $45.52 | $40.99 | $37.52 | $35.27 |
| U.S. Cellular | $53.58 | $49.32 | $49.03 | $46.89 |
| **Industry ARPU** | **$42.27** | **$38.54** | **$35.93** | **$34.73** |

Source: UBS Data 2017.

22.      *Estimated Average Revenue per MB.*  Given the variation in data plans, including shared plans, the lack of information on how much data users consume across these different plans, and the fact that revenues specific to data consumption are no longer reported by service providers, we lack the necessary information to measure precisely a true price per megabyte (MB) data used.  However, by making certain assumptions,[70] we can calculate various industry-wide estimates of the average revenues per MB.  Figure A-15 below shows four different estimates of the average revenue per MB, based on data from CTIA and the U.S. Census Bureau.  All four estimates indicate that average revenue per MB has been declining.  Specifically, as of year-end 2017, these estimates show a decrease of approximately 10% to approximately 29% compared to 2016, and a decrease of approximately 72% to approximately 83% compared to 2013.

---

[70] For a full discussion of the methodology used to derive $/MB, *see Twentieth Report*, 32 FCC Rcd at 9010, para. 61 & n.202.

**Federal Communications Commission**                                    **FCC 18-181**



Source: Based on data from the CTIA Wireless Industry Indices Year-End 2017 and the U.S. Census.

### 3.       Non-Price Competition

#### a.       Investment

23.       Over the past 8 years, mobile wireless service providers in the United States have invested, based on CTIA data,[71] more than $229.5 billion in their networks,[72] which has resulted in higher data speeds, expanded network coverage, and increased network densification.[73]  Based on UBS data, wireless service providers made capital investments of $28.5 billion in 2017, an increase of approximately 2.3% from the $27.9 billion invested in 2016.  As shown in Figure A-16, absolute capital expenditures by AT&T and Verizon Wireless consistently have exceeded those by T-Mobile and Sprint.  In 2016-17, AT&T, T-Mobile, and Verizon Wireless each had CAPEX of approximately 16.3% to 17.4% of service revenue.[74]  CAPEX by Sprint, on the other hand, varied considerably over the past few years, from

---

[71] According to CTIA, the capital investment reported "excludes the cost of licenses used to deliver wireless service, whether acquired at private or public auctions, or via other acquisition processes. Likewise, investment by third-party tower erectors, and non-carrier owners or managers of networks, is not tracked by nor reflected in CTIA's survey.  CTIA's survey collects only historical (past data) and not projected or planned investment." CTIA Wireless Industry Indices Year-End 2017, at 47.

[72] CTIA Wireless Industry Indices Year-End 2017, at 47.

[73] The *Sixteenth Report* noted that CAPEX in system/network assets may be cyclical or "lumpy" because technological change in the mobile wireless service industry is commercially implemented in successive generations of technologies.  Consequently, CAPEX may vary between periods and fluctuations in measures of CAPEX are consistent with the cyclical nature of technological adoption in the mobile wireless service industry.  *Sixteenth Report*, 28 FCC Rcd at 3842, para. 215.

[74] UBS Data, Sept. 2018.

**Federal Communications Commission**                                      **FCC 18-181**

approximately 17% of service revenue in 2015, to 7.5% in 2016, before increasing to 11% in 2017.[75]  The mobile wireless industry is currently in the process of preparing for the introduction of 5G services, and equipment vendors such as Ericsson reported that its "networks segment saw a 2% increase year-over-year with North American (U.S.) operators' investments in 5G driving that growth."[76]



Source: UBS US Wireless 411, Version 55, Figure 54; UBS US Wireless 411, Version 57, Figure 60; UBS US Wireless 411, Version 59, Figure 72; Wireless 411, February 2017, Figure 38; UBS Data 2017.

### b.    Mobile Wireless Devices, Services, and Advertising

24.    Mobile wireless service providers compete by offering consumers a large variety of mobile wireless devices and differentiated services at a variety of prices.[77]  In addition, they compete for customers by advertising and marketing, with marketing campaigns focusing on the quality, coverage, and reliability of their mobile broadband networks.[78]  They also have promoted the advantages of their particular service plans, including unlimited plans and the prices of their plans relative to those of their rivals.[79]  Some providers marketed mobile wireless service plan bundles with content offerings or device offerings: for example, Verizon Wireless advertised its unlimited plan alongside an offering for Google's

---

[75] *Id.*

[76] RCR Wireless, Ericsson focused on 5G in the US, its biggest market (Aug. 10, 2018), https://www.rcrwireless.com/20180810/5g/ericsson-focused-on-5g-in-the-us-its-biggest-market.

[77] *Twentieth Report*, 32 FCC Rcd at 9011, para. 62.

[78] *See id.* at 9013, para. 66; FierceWireless, The Top 5 Wireless Ads: Verizon spends $30M on Pixel 2 spots in November (Dec. 12, 2017), https://www.fiercewireless.com/wireless/top-5-wireless-ads-verizon-spends-30m-pixel-2-spots.

[79] *Id.*

Pixel 2 phone, while Sprint and AT&T both advertised their plans alongside offerings for Apple's iPhone.[80]  AT&T advertised free HBO with its unlimited data plans, and T-Mobile advertised a free subscription to Netflix.[81]  In 2017, Verizon Wireless spent more than $2.6 billion on advertising, down slightly from $2.7 billion in 2016; AT&T spent $3.8 billion, similar to its 2016 spending; T-Mobile spent $1.8 billion, up slightly from $1.7 billion in 2016; and Sprint spent $1.3 billion, up slightly from $1.1 billion in 2016.[82]

### c.      Speed of Service

25.      Network speed is a key characteristic of mobile wireless performance, and the Commission has recognized the importance of accurate and timely data on wireless upload and download speeds.[83]  Mobile broadband speeds experienced by consumers can vary greatly with a number of factors, including the service provider's received signal quality, cell traffic loading and network capacity in different locations, as well as the capabilities of consumers' devices.[84]  Because these and other factors cause variations in mobile network performance, various methodologies are used to measure mobile network speeds.  The two most prevalent methodologies rely on crowdsourced data and structured sample data.  Crowdsourced data are user-generated data produced by consumers who voluntarily download speed test applications on their mobile devices while structured sample data, by contrast, are generated from tests that control for the location and time of the tests as well as for the devices used in the test.[85]  This *Report* presents speed data using the Ookla Net Index data (crowdsourced), OpenSignal data (crowdsourced), and RootMetrics (structured sample).[86]

26.      Figures A-17 and A-18 present the nationwide mean and median LTE download and upload speeds based on Ookla data by service provider for the second half of 2016 through the second half of 2017.[87]  Figure A-19 presents the increase over time for mean and median LTE download speeds

---

[80] *Id.*

[81] *Id.*

[82] Verizon, 2017 Annual Report (Form 10-K) at note 14 (Feb. 23, 2018); Verizon, 2016 Annual Report (Form 10-K) at note 14 (Feb. 21, 2017); AT&T Inc., 2017 Annual Report (Form 10-K) at note 19 (Feb. 20, 2018); AT&T Inc., 2016 Annual Report (Form 10-K) at note 18 (Feb. 17, 2017); T-Mobile 2017 Annual Report (Form 10-K) at 68 (Feb. 20, 2018); T-Mobile 2016 Annual Report (Form 10-K) at 60 (Feb. 14, 2017); Sprint 2017 Annual Report (Form 10-K) at F-17 (May 24, 2018); Sprint, 2016 Annual Report (Form 10-K) at F-16 (May 26, 2017).

[83] *See generally Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, GN Docket No. 17-199, 33 FCC Rcd 1660, 1673, para. 31 & n.92 (2018) (*2018 Broadband Deployment Report*).  In addition, in the section on broadband deployment, we assess the extent to which Americans are covered by mobile LTE (based on Form 477 data at minimum advertised speeds of 5 Mbps/1 Mbps, and Ookla data at a median speed of 10 Mbps/3 Mbps or higher).

[84] For a detailed discussion of the various factors, *see Twentieth Report*, 32 FCC Rcd at 9033, para. 87; *Sixteenth Report*, 28 FCC Rcd at 3895, para. 293.

[85] For a detailed discussion of crowdsourcing and structured sample data, *see Twentieth Report*, 32 FCC Rcd at 9033-34, para. 88.

[86] The results based on the CalSPEED drive-test data gathered by the California Public Utility Commission (CPUC) (structured sample) can be found in Appendix A-5: Mobile Wireless Speeds.  In addition, while speed metrics based on the FCC Speed Test (available for both Android phones and the iPhone) were reported in the *Seventeenth Report* through the *Nineteenth Report*, we did not report these metrics in the *Twentieth Report* and do not report them in this *Report* due to certain anomalies found in the underlying data.  An in-depth discussion of the Measuring Broadband America Program's FCC Speed Test is available in the *Seventeenth Report.  Seventeenth Report*, 29 FCC Rcd at 15467, Appendix VI., paras. 7-9; *see also* FCC, Measuring Mobile Broadband Performance, http://www.fcc.gov/measuring-broadband-america/mobile.

[87] Ookla gathers crowdsourced mobile speed data through the use of its Speedtest mobile app.  Speedtest, Ookla Speedtest Mobile Apps, http://www.speedtest.net/mobile/.  An in-depth discussion of the Ookla speed test is

(continued….)

for all providers, from the first half of 2016 through the first half of 2018.  Based on Ookla data, Figure A-19 indicates that the median LTE download speed increased from 12.8 Mbps to 19.5 Mbps, an increase of approximately 52%, over this time period.

**Fig. A-17**
**Ookla Speed Test--Estimated LTE Download Speeds by Service Provider, Nationwide**

| Service Provider | 2H2016 | | | 1H2017 | | | 2H2017 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mean Down load Speed (Mbps) | Median Down load Speed (Mbps) | Number of Tests ('000s) | Mean Down load Speed (Mbps) | Median Down load Speed (Mbps) | Number of Tests ('000s) | Mean Down load Speed (Mbps) | Median Down load Speed (Mbps) | Number of Tests ('000s) |
| AT&T | 22.74 | 16.23 | 2,519 | 23.63 | 16.12 | 2,664 | 23.66 | 15.55 | 2,834 |
| Sprint | 15.51 | 9.20 | 2,269 | 18.11 | 9.81 | 2,407 | 21.78 | 11.11 | 2,123 |
| T-Mobile | 23.61 | 16.72 | 3,744 | 26.20 | 18.32 | 3,769 | 30.48 | 21.12 | 3,498 |
| Verizon Wireless | 23.51 | 17.12 | 3,044 | 23.82 | 16.32 | 4,362 | 25.93 | 16.78 | 4,269 |

Source: Ookla SPEEDTEST intelligence data, © 2018 Ookla, LLC.  All rights reserved.  Published with permission of Ookla.

**Fig. A-18**
**Ookla Speed Test - Estimated LTE Upload Speeds by Service Provider, Nationwide**

| Service Provider | 2H2016 | | | 1H2017 | | | 2H2017 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mean Upload Speed (Mbps) | Median Upload Speed (Mbps) | Number of Tests ('000s) | Mean Upload Speed (Mbps) | Median Upload Speed (Mbps) | Number of Tests ('000s) | Mean Upload Speed (Mbps) | Median Upload Speed (Mbps) | Number of Tests ('000s) |
| AT&T | 7.42 | 5.23 | 2,519 | 7.46 | 5.13 | 2,664 | 7.53 | 4.91 | 2,834 |
| Sprint | 4.73 | 3.48 | 2,269 | 4.83 | 3.51 | 2,407 | 3.82 | 2.69 | 2,123 |
| T-Mobile | 11.98 | 9.37 | 3,744 | 12.07 | 9.45 | 3,769 | 11.99 | 9.36 | 3,498 |
| Verizon Wireless | 8.28 | 4.93s | 3,044 | 8.69 | 5.24 | 4,362 | 9.11 | 5.56 | 4,269 |

Source: Ookla SPEEDTEST intelligence data, © 2018 Ookla, LLC.  All rights reserved.  Published with permission of Ookla.

(Continued from previous page) ————————————————

available in the *Seventeenth Report*.  *Seventeenth Report*, 29 FCC Rcd at 15465-66, Appendix VI., paras. 1-6.  The upload and download speeds were calculated by Ookla and provided to the Commission for use in this *Report*.  Note that in recent years, Ookla has updated their data cleaning and aggregation rules, and thus the reported data may differ slightly from previous *Reports*.

**Federal Communications Commission**                                    **FCC 18-181**



Source: Ookla SPEEDTEST intelligence data, © 2018 Ookla, LLC.  All rights reserved.  Published with permission of Ookla.

27.      Nationwide average LTE download speeds for the second half of 2016 through the second half of 2017 from OpenSignal are presented in Figure A-20 below.[88]

**Fig. A-20**
**OpenSignal –Estimated LTE Download Speeds, Nationwide**

| Service Provider | 2H2016 | 1H2017 | 2H2017 |
|---|---|---|---|
| | Av. Download Speed (Mbps) | Av. Download Speed (Mbps) | Av. Download Speed (Mbps) |
| AT&T | 13.86 | 12.92 | 13.27 |
| Sprint | 8.99 | 9.76 | 12.02 |
| T-Mobile | 16.65 | 17.45 | 19.42 |
| Verizon Wireless | 16.89 | 14.91 | 17.77 |
| Total | 13.95 | 14.99 | 16.31 |

Source: OpenSignal, 2018, © OpenSignal.

28.      We present in Figure A-21 the mobile wireless indices within the United States for the second half of 2016 through the second half of 2017 from RootMetrics.[89]

---

[88] OpenSignal gathers crowdsourced mobile speed data through the use of its mobile app.  OpenSignal, State of Mobile Networks: USA, https://opensignal.com/reports/2017/02/usa/state-of-the-mobile-network.  In addition to user-initiated tests, OpenSignal also collects network speed measurements at a high frequency per user, https://opensignal.com/methodology.  OpenSignal does not provide summary statistics for LTE upload speeds before the first half of 2018, thus only LTE download speeds are included.

[89] RootMetrics, Methodology, http://rootmetrics.com/en-US/methodology.  RootMetrics performs drive tests and stationary tests in specific locations, using the leading Android-based smartphone for each network.  RootScores are scaled from 0 to 100.  An in-depth discussion of the RootMetrics dataset is available in the *Seventeenth Report*, 29 FCC Rcd at 15467-68, Appendix VI., paras 10-11.

**Fig. A-21**
**RootMetrics National Speed Index Data, 2nd Half 2016--2st Half 2017**

| Service Provider | 2nd Half 2016 | | | 1st Half 2017 | | | 2nd Half 2017 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Speed Index | Data Index | Text Index | Speed Index | Data Index | Text Index | Speed Index | Data Index | Text Index |
| AT&T | 89.6 | 94.4 | 95.3 | 91.4 | 95.5 | 95.6 | 92.3 | 95.7 | 96.0 |
| Sprint | 72.3 | 82.5 | 95.0 | 78.2 | 86.6 | 95.2 | 77.8 | 87.7 | 95.2 |
| T-Mobile | 87.1 | 90.6 | 89.1 | 90.5 | 93.2 | 89.5 | 90.9 | 93.1 | 91.5 |
| Verizon Wireless | 93.3 | 96.5 | 96.5 | 92.9 | 96.5 | 96.5 | 93.2 | 96.5 | 96.8 |

Source: RootMetrics Data, © RootMetrics.  All rights reserved.  Published with permission of RootMetrics.

### 4.    Entry Conditions and Market Concentration

29.    *Entry Conditions.*  To evaluate the competitiveness of any market, one must consider multiple factors, including prices and trends in prices, non-price rivalry, investment, innovation, and any barriers to entry.[90]  Entry conditions are important in helping to understand the degree to which incumbent firms may or may not possess market power, which is the ability to maintain prices above competitive levels.  High barriers to entry reduce the number of competitors in a market and reduce the threat to incumbents of new entry.[91]  Entry occurs in the context of underlying regulatory and market conditions that directly influence the total number of firms that can successfully compete.  In the mobile wireless marketplace, there are both regulatory and non-regulatory barriers to entry.  Regulatory barriers to entry arise from government-imposed regulations, rules, and restrictions that may impose additional costs for entrants or that may directly prohibit or limit entry.  For the most part, they are related to the inputs necessary to offer mobile wireless services.  Examples of regulatory barriers include spectrum policy, which affects the spectrum capacity available for mobile wireless services and regulations regarding tower and antenna siting, which affect whether and how quickly mobile wireless network can be deployed or expanded.  Non-regulatory or market conditions that may determine the number of providers that can operate in the market, or may deter entry, include efficiencies of size and scale, permanent asymmetries across service providers' costs, difficulties in acquiring access to sites for network infrastructure, and capital cost requirements, such as those costs incurred in acquiring spectrum or deploying a nationwide network.

30.    *Market Concentration (NRUF Data).*  High market concentration levels in any market may raise some concern that a market is not competitive, although we note that this is not necessarily the case.[92]  To measure mobile wireless concentration, the Commission employs the Herfindahl-Hirschman

---

[90] *Applications of AT&T Inc. and DIRECTV For Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9140, paras. 19-20 (2015); *AT&T-Leap Order*, 29 FCC Rcd at 2756-57, para. 49; *Applications of AT&T Wireless Services, Inc. and Cingular Wireless Corporation*, Memorandum Opinion and Order, 19 FCC Rcd 21522, 21544-45, paras. 41-42 (2004).

[91] High economic profits encourage entry into the market, low economic profits discourage entry, and prolonged negative economic profits induce exit from the market.  *See e.g.,* Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, W. W. Norton and Company, 2014, at 433-34; Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed.), Addison, Wesley, Longman, Inc., 2005, at 61, 76.  *See also* George S. Ford, et al., *Competition After Unbundling: Entry, Industry Structure, and Convergence*, Federal Communications Law Journal, 2007, 59: 2, at 344.

[92] It is well understood that we can observe intense competition even with a small number of firms in the market.  *See, e.g.,* Ernest Gellhorn, *Antitrust Law and Economics* (4th ed.), West Publishing, at 117 (1994) (stating "[m]arket shares are not synonymous with market power; they should mark the beginning for careful analysis, not the end of

(continued….)

Index (HHI), widely used in competition analysis to measure market concentration. HHI is calculated by summing the squared market shares of all firms in the given market.[93] In this *Report*, we calculate HHIs based on the NRUF data by Economic Area (EA) to maintain continuity with past reports, and to ensure that we do not compromise the confidential information found in the NRUF data.[94] As of year-end 2014, the weighted average HHI (weighted by population across the 172 EAs in the United States) for mobile wireless services was 3,138. As of year-end 2017, the weighted average HHI for mobile wireless services was 3,106.[95] Figure A-22 shows the relationship between the HHI by EA and EA population densities. This chart indicates that HHI values tend to decline as the population density increases. The most concentrated EAs tend to be more rural, while major metropolitan areas lie in the least concentrated EAs. This likely reflects greater demand and greater cost efficiencies (per-user mobile wireless network deployment costs tend to decrease with increases in the population density) in more densely-populated areas.[96]

(Continued from previous page) ————————————————
it."); Michael Whinston, Antitrust Policy toward Horizontal Mergers, *Handbook of Industrial Organization,* Vol. 3, ed. Mark Armstrong and Robert Porter, Elsevier (2007); John Sutton, *Sunk Costs and Market Structure*, MIT Press (1991); Joseph Farrell and Carl Shapiro, Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition, *The B.E. Journal of Theoretical Economics*, Vol.10, Issue 1, Article 9; Gregory J, Werden and Luke M. Froeb, Unilateral Competitive Effects of Horizontal Mergers in *Handbook of Antitrust Economics*, ed. Paolo Buccirossi, MIT Press (2008).

[93] To the extent that this section uses the term "markets," we do not intend it to be interpreted as synonymous with the antitrust concept of the "relevant market," which the Commission defines in the context of secondary market transactions review. *See, e.g.*, *Applications of AT&T Inc., Leap Wireless International, Inc., Cricket License Co., LLC and Leap Licenseco, Inc. for Consent To Transfer Control and Assign Licenses and Authorizations*, Memorandum Opinion and Order, 29 FCC Rcd 2735, 2748, para. 27 (WTB, IB 2014) (*AT&T-Leap Order*).

[94] NRUF subscriber data indicate the number of assigned phone numbers that a wireless service provider has in a particular rate center (there are approximately 18,000 rate centers in the country). Rate centers are geographic areas used by local exchange carriers for a variety of reasons, including the determination of toll rates. Harry Newton, Newton's Telecom Dictionary: 19th Expanded & Updated Edition 660 (July 2003). All mobile wireless service providers must report to the Commission the quantity of their phone numbers that have been assigned to end users, thereby permitting the Commission to calculate the total number of mobile wireless subscribers. For purposes of geographical analysis, the rate center data can be associated with a geographic point, and all of those points that fall within a county boundary can be aggregated together and associated with much larger geographic areas based on counties. We note that the aggregation to larger geographic areas reduces the level of inaccuracy inherent in combining non-coterminous areas, such as rate center areas and counties.

[95] Antitrust authorities in the United States generally classify markets into three types: Unconcentrated (HHI < 1500), Moderately Concentrated (1500 < HHI < 2500), and Highly Concentrated (HHI > 2500). U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines (Aug. 19, 2010), http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf.

[96] Relatively high fixed costs in relation to the number of customers may limit the number of firms that can enter and survive in a market. *See, e.g.,* John Sutton, *Sunk Costs and Market Structure*, MIT Press (1991); Luis Cabral, *Introduction to Industrial Organization*, MIT Press, Chapter 14 (2000); Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed.), Addison, Wesley, Longman, Inc., at 41 (2005); George S. Ford, et al., *Competition After Unbundling: Entry, Industry Structure, and Convergence*, Federal Communications Law Journal, 59:2, at 332, 337 (2007).



**5.      Mobile Wireless Spectrum**

31.        Spectrum is a critical input in the provision of mobile wireless services.[97]  It can affect whether, when, and where existing service providers and potential entrants will be able to expand capacity or deploy networks.[98]  Incumbent service providers may need additional spectrum to increase their coverage or capacity, while new entrants need access to spectrum to enter a geographic area. Spectrum bands vary in breadth and in their propagation characteristics, and these variations have implications for how spectrum is deployed.[99]  The effective supply of spectrum capacity that is available for mobile wireless service depends on several aspects of spectrum policy, including allocation and

---

[97] Non-spectrum inputs in the provision of mobile wireless services include cellular base stations and towers to carry transmissions and backhaul, which routes voice and data traffic from base stations to mobile switching centers. Backhaul may be provided via wireless spectrum, copper, or fiber, though copper may lack sufficient capacity for current data demands.

[98] *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6134, para. 2.

[99] Spectrum below 1 GHz (low-band spectrum) has certain propagation advantages for network deployment over long distances, and for penetrating buildings and urban canyons, while spectrum above 1 GHz (mid- or high-band spectrum) allows for the better transmission of large amounts of information.  *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6135, para. 3.  In this sense, low-band spectrum may be thought of as "coverage" spectrum, and higher band spectrum may be thought of as "capacity" spectrum.  Service providers deploy their spectrum bands differently depending on the nature of the service, geography, density, or other factors in their network build-out.  *Twentieth Report*, 32 FCC Rcd at 8992, para. 36 & n.112; *Sixteenth Report*, 28 FCC Rcd at 3789, para. 119.

licensing policies, as well as interference and technical rules.[100] Increasing the total supply of spectrum bandwidth that the Commission allocates and licenses to mobile wireless service providers can increase network capacity and reduce the degree of frequency reuse required to achieve a given level of capacity.[101] Therefore, spectrum policies affect the ability of incumbents and potential entrants to access spectrum and to build out or expand capacity. The efforts of the Commission to allocate more mid-band and millimeter wave spectrum to meet consumer demand for mobile broadband services, and to fuel innovation and investment in the mobile wireless market, are detailed in Sections III.A.2 and IV below.

32. Subject to the Commission's approval, licensees may transfer licenses, in whole or in part (through partitioning and/or disaggregation), on the secondary market.[102] In reviewing proposed transfers of control of spectrum, the Commission uses an initial spectrum screen[103] to help identify, for case-by-case review, local markets where changes in spectrum holdings resulting from the transaction may be of particular concern.[104] In the past decade, in the context of its review of secondary market transactions, the Commission periodically has determined that additional spectrum was suitable and available for mobile wireless use, and therefore subject to inclusion in the spectrum screen.[105] The current suitable and available spectrum included in the spectrum screen is shown in Figure A-23:

---

[100] *Sixteenth Report*, 28 FCC Rcd at 3765, para.75.

[101] Rappaport, T. S., *Wireless Communications: Principles and Practice* (2nd ed.), Prentice Hall, 2002, at 58.

[102] As part of its secondary market policies, the Commission also permits mobile wireless licensees to lease all or a portion of their spectrum usage rights for any length of time within the license term and over any geographic area encompassed by the license.

[103] The Commission includes spectrum that it finds is suitable and available for the provision of mobile wireless services. *See, e.g.*, *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6169, para. 71; *See, e.g.*, *Applications of SprintCom, Inc., Shenandoah Personal Communications, LLC, and NTELOS Holdings Corp. for Consent To Assign Licenses and Spectrum Lease Authorizations and To Transfer Control of Spectrum Lease Authorizations and an International Section 214 Authorization*, Memorandum Opinion and Order, 31 FCC Rcd 3631, 3638-39, para. 17 (WTB, IB 2016) (*Sprint-Shentel-NTELOS Order*).

[104] *See, e.g.*, *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6221-22, para. 225; *see also AT&T-Leap Order*, 29 FCC Rcd at 2752-53, paras. 39, 41. In the case of transfer of business units, the Commission's initial HHI screen identifies, for further case-by-case market analysis, those markets in which, post-transaction: (1) the HHI would be greater than 2800 and the change in HHI would be 100 or greater; or (2) the change in HHI would be 250 or greater, regardless of the level of the HHI. *See, e.g.*, *Sprint-Shentel-NTELOS Order*, 31 FCC Rcd at 3639, para. 17 & n.50; *AT&T-Leap Order*, 29 FCC Rcd at 2753, para. 41 & n.140. In addition, the Commission determined in the Mobile Spectrum Holdings Report and Order that increased aggregation of below-1-GHz spectrum would be treated as an "enhanced factor" under its case-by-case review of license transfers if post-transaction the acquiring entity would hold approximately one-third or more of the currently suitable and available spectrum below 1 GHz. *See, e.g.*, *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6240, paras. 282-88.

[105] *Incentive Auction Closing and Channel Reassignment*, Public Notice, 32 FCC Rcd 2786 (WTB 2017); *Sprint-Shentel-NTELOS Order*, 31 FCC Rcd at 3637-38, paras. 15-16; *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6172-90, paras. 82-134; *Applications of AT&T Mobility Spectrum LLC, New Cingular Wireless PCS, LLC, Comcast Corporation, Horizon Wi-Com, LLC, NextWave Wireless, Inc., and San Diego Gas & Electric Company for Consent To Assign and Transfer Licenses*, Memorandum Opinion and Order, 27 FCC Rcd 16459, 16470-71, para. 31 (2012); *Amendment of Part 27 of the Commission's Rules to Govern the Operation of Wireless Communications Services in the 2.3 GHz Band*, Report and Order, 25 FCC Rcd 11710, 11711, para. 1 (2010); *Applications of Sprint Nextel Corporation and Clearwire Corporation for Consent To Transfer Control of Licenses, Leases, and Authorizations*, Memorandum Opinion and Order, 23 FCC Rcd 17570, 17598-99, paras. 70, 72 (2008); *Applications of AT&T Inc. and Dobson Communications Corporation for Consent To Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 22 FCC Rcd 20295, 20307-08, para. 17 (2007).

**Fig. A-23**
**Spectrum Included in the Spectrum Screen**[106]

| Spectrum Band | Megahertz (Amount) |
|---|---|
| 600 MHz | 70 |
| 700 MHz | 70 |
| Cellular | 50 |
| SMR | 14 |
| Broadband PCS | 130 |
| AWS-1 | 90 |
| AWS-3 | 65 |
| AWS-4 | 40 |
| H Block | 10 |
| WCS | 20 |
| BRS | 67.5 |
| EBS | 89 |
| *Total Amount of Spectrum* | *715.5* |

### 6.      Service Providers' Spectrum Holdings

33.      Figures A-24 and A-25 below present spectrum holdings by service provider.  As of August 2018, the four nationwide service providers, AT&T, Sprint, T-Mobile, and Verizon Wireless together held approximately 80% of all the spectrum included in the spectrum screen, measured on a MHz-POPs basis.  Figure A-26 shows the population-weighted average megahertz spectrum holdings of licensees by frequency band.[107]

---

[106] We note that while 15 megahertz of AWS-3 spectrum is available on a nationwide basis (1695-1710 GHz), we will evaluate the availability of the remaining 50 megahertz of AWS-3 spectrum (1755-1780 GHz and 2155-2180 GHz) on a market-by-market basis.  Further, while 112.5 megahertz of EBS spectrum is available, we discount this spectrum such that 89 megahertz is included in the screen for review of proposed transactions.  *Mobile Spectrum Holdings Report and Order*, 29 FCC Rcd at 6177-79, 6184-6187, paras. 100-102, 118-25.

[107] We consider population-weighted spectrum holdings in order to account for customer density in different geographic areas.  A spectrum license in Los Angeles or New York City, for example, covers more customers than a spectrum license over the same amount of land area in White Sands, New Mexico.

**Federal Communications Commission**  **FCC 18-181**

### Fig. A-24
**Percentage Spectrum Holdings, Measured on a MHz-POPs Basis
by Licensee, by Frequency Band**[*]

| | 600 MHz | 700 MHz | Cell. | SMR | PCS | H Block | AWS-1 | AWS-3 | AWS-4 | WCS | BRS | EBS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Spectrum** | 70 meg. | 70 meg. | 50 meg. | 14 meg. | 130 meg. | 10 meg. | 90 meg. | 65 meg. | 40 meg. | 20 meg. | 67.5 meg. | 89 meg. ** |
| **AT&T** | 3.8% | 41.9% | 44.6% | 0.0% | 29.1% | 0.0% | 16.2% | 33.5% | 0.0% | 100.0% | 0.0% | 0.0% |
| **Sprint** | 0.0% | 0.4% | 0.0% | 96.5% | 29.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 93.1% | 95.7% |
| **T-Mobile** | 45.3% | 14.2% | 0.1% | 0.0% | 22.3% | 0.0% | 41.1% | 5.5% | 0.0% | 0.0% | 0.0% | 0.0% |
| **VZW** | 0.0% | 31.0% | 47.6% | 0.0% | 16.6% | 0.0% | 39.7% | 18.9% | 0.0% | 0.0% | 0.0% | 0.0% |
| **USCC** | 2.6% | 3.5% | 4.0% | 0.0% | 1.1% | 0.0% | 0.8% | 2.6% | 0.0% | 0.0% | 0.0% | 0.0% |
| **DISH** | 26.2% | 6.6% | 0.0% | 0.0% | 0.0% | 100.0% | 0.0% | 34.8% | 100.0% | 0.0% | 0.0% | 0.0% |
| **Other** | 22.0% | 2.3% | 3.7% | 3.5% | 2.0% | 0.0% | 2.2% | 4.9% | 0.0% | 0.0% | 6.9% | 4.3% |

* Staff estimates as of Aug. 2018.  Abbreviations for spectrum bands: Cell. (Cellular), SMR (Specialized Mobile Radio Service), PCS (Personal Communications Service), BRS (Broadband Radio Service), and EBS (Educational Broadband Service).
** In accordance with the spectrum screen in proposed secondary market transactions, only 89 megahertz of EBS spectrum is included.

### Fig. A-25
**Population-Weighted Average Megahertz Holdings by Licensee, by Frequency Band**[*]

| | 600 MHz | 700 MHz | Cell. | SMR | PCS | H Block | AWS-1 | AWS-3 | AWS-4 | WCS | BRS | EBS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Spectrum Counted** | 70 meg. | 70 meg. | 50 meg. | 14 meg. | 130 meg. | 10 meg. | 90 meg. | 65 meg. | 40 meg. | 20 meg. | 67.5 meg. | 89 meg. ** |
| **AT&T** | 2.6 | 29.4 | 23.6 | 0.0 | 37.9 | 0.0 | 14.6 | 20.3 | 0.0 | 20.0 | 0.0 | 0.0 |
| **Sprint** | 0.0 | 0.3 | 0.0 | 13.8 | 37.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 62.9 | 85.2 |
| **T-Mobile** | 30.8 | 10.0 | 0.0 | 0.0 | 29.0 | 0.0 | 37.0 | 3.3 | 0.0 | 0.0 | 0.0 | 0.0 |
| **VZW** | 0.0 | 21.7 | 25.2 | 0.0 | 21.6 | 0.0 | 35.7 | 11.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| **USCC** | 1.8 | 2.5 | 2.1 | 0.0 | 1.4 | 0.0 | 0.7 | 1.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| **DISH** | 17.8 | 4.6 | 0.0 | 0.0 | 0.0 | 10.0 | 0.0 | 21.1 | 40.0 | 0.0 | 0.0 | 0.0 |
| **Other** | 14.9 | 1.6 | 2.0 | 0.5 | 2.6 | 0.0 | 2.0 | 3.0 | 0.0 | 0.0 | 4.6 | 3.8 |

* Staff estimates as of Aug. 2018.
** In accordance with the spectrum screen in proposed secondary market transactions, only 89 megahertz of EBS spectrum is included.

**Federal Communications Commission**                                        **FCC 18-181**

**Fig. A-26**
**Spectrum Holdings by Band Weighted by Population**



Note: Staff estimates as of Aug. 2018.

### 7.   Wireless Infrastructure

34.       Wireless infrastructure facilities constitute another major input in the provision of mobile wireless services.[108]  In addition to towers and other tall structures, such as lattice towers, guyed towers, monopoles, rooftops, water towers, and steeples, wireless infrastructure also includes distributed antenna systems (DAS) and small cells. [109]  In order to expand or to improve coverage in existing service areas, and to accommodate newer technologies, mobile service providers historically have deployed additional cell sites.  According to CTIA, cell sites in commercial use have mostly increased in the last five years, from 304,360 at year-end 2013, to 298,005 in 2014, 307,626 in 2015, 308,334 in 2016, and 323,448 at year-end 2017.[110]

---

[108] Another component is the backhaul connections that link a mobile wireless service provider's cell sites to the mobile switching centers that provide connections to the provider's core network, the public switched telephone network, or the Internet, carrying wireless voice and data traffic for routing and onward transmission.  Backhaul facilities are generally provided by incumbent local exchange carriers (ILECs), competitive local exchange carriers (CLECs), competitive fiber and microwave wholesalers, cable providers, and independent backhaul operators. *Twentieth Report,* 32 FCC Rcd at 8997-98, para. 42 & n.135; *Sixteenth Report*, 28 FCC Rcd at 3912, para. 336.

[109] For a full description of DAS and small cells, see *Twentieth Report*, 32 FCC Rcd at 8997, para 42, n.133 & n.134.

[110] CTIA Wireless Industry Indices Year-End 2017, at 54.  Because multiple cell sites can be collocated in the same "tower" site, the reported cell sites should not be equated with "towers."  The reported cell sites include repeaters and other cell-extending devices (e.g., femtocells or distributed antenna systems).  *Id.* at 53.  Based on UBS Data 2017, the number of AT&T's cell sites increased from 67,000 at the end of 2016 to 70,300 at the end of 2017, Verizon Wireless's increased from 58,300 to 61,800, T-Mobile's increased from 59,417 to 61,457, and Sprint's stayed at 50,000.  Note that the decrease in the total number of commercial cell sites in 2014 from 2013 is likely due to "a combination of consolidation and the retirement of older generation of technologies."  CTIA Wireless Industry Indices Report Year-End 2014, at p. 101-102.

35. Mobile service providers increasingly have started to deploy small cells and DAS sites to fill local coverage gaps, to densify networks and increase local capacity, or to prepare for deploying their 5G network.[111] Estimates for small cell deployment by the end of 2018 range from 80,000 to 400,000.[112] Rather than building their own DAS deployments, some service providers share neutral host systems owned by third-party operators.[113] Today, there are more than 120 tower and DAS operators in the United States,[114] and a majority of towers are now owned or operated by independent tower companies rather than by mobile wireless service providers. In most cases, tower operators and property owners lease antenna, rooftop and other site space to multiple wireless service providers.[115]

36. The three largest publicly-traded neutral host providers are Crown Castle, American Tower, and SBA Communications. These three companies alone invested nearly $2.5 billion dollars in 2017, an increase of nearly 25% over 2016.[116] As of December 2017, according to one estimate, these three infrastructure providers owned or operated approximately 95,000 towers (not including DAS and small cells).[117] At the end of December 2017, they had 1.7 to 2.2 tenants per tower site and had significant capacity available for additional antennas or tenants.[118] Figure A-27 shows that, as of April 2018, there were three or more tower operators in 83% of counties nationwide, and four or more tower operators in 61% of counties.[119]

---

[111] *Twentieth Report,* 32 FCC Rcd at 8998, para. 43.

[112] CTIA Comments at 51 (80,000 small cells); Wireless Infrastructure Association (WIA) Comments at 7 (125,000 small cells). *See also* RCR Wireless, North American Enterprises to Deploy 400,000 Small Cells This Year (Apr. 5, 2018), https://www.rcrwireless.com/20180405/network-infrastructure/north-american-enterprises-deploy-400000-small-cells-tag23.

[113] American Tower Corporation 2017 Annual Report, at 6; *see also* Clearsky Technologies, ClearSky to Launch First American "Small Cell as a Service" Carrier Customer, http://www.csky.com/launches-first-scaas-carrier-customer/.

[114] Wireless Estimator, Top 100 Tower Companies in the U.S., http://wirelessestimator.com/top-100-us-tower-companies-list/.

[115] *See, e.g.*, American Tower 2017 Annual Report, Part 1 at 3; *see also* Crown Castle 2017 Annual Report, Part 1, at 20; FierceWireless, Crown Castle executive sees small cells moving to multitenant scenarios, smaller markets, https://www.fiercewireless.com/wireless/crown-castle-exec-sees-small-cells-moving-to-multi-tenant-scenarios-smaller-markets; Verizon Wireless, http://www.verizonwireless.com/b2c/realestate/.

[116] WIA Comments at 2.

[117] Wireless Estimator, Top 100 Tower Companies in the U.S. (Crown Castle at 40,039, American Tower at 39,989, SBA at 14,873, and as of May 2018, not including rooftop sites, DAS and small cells), http://www.wirelessestimator.com/t_content.cfm?pagename=US-Cell-Tower-Companies-Complete-List.

[118] American Tower 2017 Annual Report, Part I, at 4 (1.9 tenants per tower), Crown Castle 2017 Annual Report, Part 1, at 18 (2.2 tenants per tower), and SBA 2017 Annual Report, Item 1, at 3 (1.7 tenants per tower).

[119] Tower site information was downloaded from 49 tower providers' websites in April 2018. Wireless Estimator, Top 100 Tower Companies in the U.S., http://www.wirelessestimator.com/t_content.cfm?pagename=US-Cell-Tower-Companies-Complete-List.



Source: 49 tower companies' data on standalone towers, rooftops, DAS, and small cells (April 2018).

### 8.    Network Coverage

37.      We measure network coverage based on Form 477 data,[120] and we use the actual area methodology, which analyzes the data on a sub-census-block level, and calculates the percentage of each census block covered by each technology.[121]  Unlike the centroid methodology where a particular census block is either covered or not, the actual area methodology estimates the area of the census block covered by each service provider by technology.[122]  Because we currently do not know the distribution of the population at the sub-census-block level, however, we must approximate the population covered by each technology.  To do this, we assume, for purposes of this *Report,* that the population of a census block is uniformly distributed such that the fraction of the population covered in a block is proportional to the fraction of the actual area covered.  We then sum the estimated covered population across blocks to estimate the total covered population within the United States.  Likewise, we assume that the fraction of the road miles covered in a block is proportional to the fraction of the actual area covered.[123]

---

[120] For a detailed description of the Form 477 data collection, *see Twentieth Report*, 32 FCC Rcd at 9015, para. 69.

[121] The centroid methodology considers a census block covered if the geometric center point, or centroid, is covered. The methodology estimates coverage of population, land and road miles by aggregating the totals for "covered" census blocks.  *Twentieth Report*, 32 FCC Rcd at 9016-17, para. 71.  In practice, actual area and centroid methodologies yield similar results at the national level.  *Twentieth Report*, 32 FCC Rcd at 9017-18, para. 72.  We present coverage maps based on the centroid methodology in Appendix A-6: Mobile Wireless Coverage Maps.  In addition, we report our results based on the centroid and actual area methodologies in Appendix A-7: Mobile Wireless Coverage.

[122] This sub-census-block analysis can tell us the unique combination of service providers serving a particular percentage of the area in a census block with a certain technology.  As this analysis was done at each technology level, the set of unique combinations that it produces are valid for each individual technology but not across multiple technologies.  Essentially, we can distinguish the unique percentages covered by various service providers at the sub-census-block level using a particular technology (e.g., LTE), but we do not currently know how this interplays with other technologies (e.g., with 2G or 3G technologies).  Therefore, we can calculate the areas served and not served by all wireless technologies (LTE, non-LTE 4G, 3G, and 2G technologies) only at the national level.

[123] In order to fully exploit the increase in precision offered by the actual area coverage methodology, spatially accurate representations of population and road miles would be necessary.  We do not have access to such information at this time for the current *Report*, however.

38.　　As the Commission has stated, having accurate and reliable mobile broadband deployment data is critical to policymakers as well as to consumers.[124]  We observe that, while the current Form 477 deployment data is an improvement over the deployment data previously available on a national scale, questions have arisen in various contexts regarding the bases for certain filings.[125]  For example, in the context of the Mobility Fund Phase II (MF-II) proceeding, the Commission determined that a separate, one-time data collection was necessary to ensure that all Form 477 filers were using a consistent standard when reporting their deployment of 5 Mbps 4G LTE services.[126]  In addition, the Commission has initiated a rulemaking to consider improvements in the Form 477 data collection process.[127]

39.　　In this Section, we first present our estimates of mobile wireless coverage by individual service provider using any technology.  Second, we present our LTE coverage estimates for the percentage of the U.S. population, land area, and road miles, by number of service providers, before turning to LTE coverage by individual service providers.  Finally, we present our estimates of coverage in rural and non-rural areas, first by number of service providers, and then by individual service providers.  Unless otherwise noted, we rely on Form 477 data as of December 2017 for our analysis of network coverage.

### a.　　Overall Coverage by Individual Service Provider

40.　　Figure A-28 presents estimates of mobile wireless coverage by individual mobile wireless service provider using any technology.  Figure A-28 indicates that AT&T covered census blocks containing approximately 99% of the population, while the comparable approximate percentages are 98% for Verizon Wireless, 97% for T-Mobile, and 93% for Sprint.  Verizon Wireless and AT&T each covered over 70% of the land area, while T-Mobile and Sprint each covered less than 60% of the land area.  In terms of road miles, AT&T and Verizon Wireless covered approximately 91%, T-Mobile covered approximately 79%, and Sprint covered approximately 54%.

---

[124] *Modernizing the FCC Form 477 Data Program*, Further Notice of Proposed Rulemaking, 32 FCC Rcd 6329, 6331-32, para. 8 (2017) (*Modernizing the FCC Form 477 Data Program*).

[125] *Modernizing the FCC Form 477 Data Program*, 32 FCC Rcd at 6332-33, para. 10.

[126] *Connect America Fund, Universal Service Reform—Mobility Fund*, Order on Reconsideration and Second Report and Order, 32 FCC Rcd 6282, 6286, 6287, 6298, paras. 7, 10, 34 (2017) (reconsidering the Commission's decision to use the Form 477 data given the various challenges with respect to the accuracy of the Form 477 deployment data, and determining that there would be a new one-time data collection).

[127] *See generally Modernizing the FCC Form 477 Data Program*, 32 FCC Rcd 6329.

**Federal Communications Commission**                    **FCC 18-181**



Source: Based on actual area coverage analysis of December 2017 Form 477 and 2010 Census data.  That a particular service provider has indicated that it has network coverage in a particular census block does not necessarily mean that it offers service to residents in that census block.

### b.    LTE Mobile Broadband Coverage

41.    Figure A-29 presents LTE mobile broadband coverage by number of service providers.  It shows that approximately 92% of the U.S. population lived in census blocks with LTE coverage by at least four service providers.  These census blocks only accounted for approximately 54% of road miles and approximately 30% of the total land area of the United States, however.

42.    Figure A-30 presents estimates of LTE mobile broadband coverage by individual mobile wireless service provider.  It shows that Verizon Wireless and AT&T each provided LTE coverage to census blocks containing approximately 98% of the population, T-Mobile provided LTE coverage to approximately 96% of the population, while Sprint provided LTE coverage to approximately 91% of the population.  In terms of road miles and land area, Verizon Wireless covered approximately 89% of road miles and 70% of the land area, AT&T covered approximately 80% of road miles and 57% of the land area, T-Mobile covered approximately 79% of road miles and 57% of the land area, and Sprint covered approximately 50% of road miles and 26% of the land area with LTE.

Federal Communications Commission                    FCC 18-181



Source: Based on actual area coverage analysis of December 2017 Form 477 and 2010 Census data. That a particular service provider has indicated that it has network coverage in a particular census block does not necessarily mean that it offers service to residents in that census block.



Source: Based on actual area coverage analysis of December 2017 Form 477 and 2010 Census data. That a particular service provider has indicated that it has network coverage in a particular census block does not necessarily mean that it offers service to residents in that census block.

### c.     Rural/Non-Rural Comparisons

43.     Although the Communications Act does not include a statutory definition of what constitutes a rural area, the Commission, for purposes of its analysis for the *Mobile Wireless Competition Report*, has defined a rural area as one with a population density of 100 people per square mile or less.[128] To determine whether counties are rural or non-rural, we first excluded all water-only census blocks within each county.  We then divided the county population by the total geographic area of the county to determine the population density.  For those counties with a population density of 100 people per square mile or less, all census blocks within those counties were considered rural.  Under this definition and using 2010 U.S. Census data, approximately 56 million people, or approximately 18% of the U.S. population, live in rural counties.  These counties comprise approximately 3 million square miles, or approximately 84%, of the geographic area of the United States.

44.     Figure A-31 presents mobile wireless coverage (using any technology) of the rural and non-rural U.S. population by individual mobile wireless service provider.  Our analysis indicates that all four nationwide service providers covered at least 97% of the non-rural population with mobile wireless service.  Rural wireless coverage by service provider was more limited: AT&T covered approximately 97%, Verizon Wireless covered approximately 95%, T-Mobile covered approximately 86%, and Sprint covered approximately 68% of the rural population with wireless service.



Source: Based on actual area coverage analysis of December 2017 Form 477 and 2010 Census data.  That a particular service provider has indicated that it has network coverage in a particular census block does not necessarily mean that it offers service to residents in that census block.

45.     Figure A-32 presents LTE population coverage in rural and non-rural census blocks by number of service providers.  Our estimates show that approximately 99% of the non-rural population was covered by at least three LTE service providers, while approximately 91% of the rural population had the same network coverage.  Approximately 97% of the non-rural American population had LTE coverage from four or more service providers, while only approximately 68% of the rural population was covered by at least four LTE service providers.

---

[128] *Twentieth Report*, 32 FCC Rcd at 9000-01, para. 45; *Facilitating the Provision of Spectrum-Based Services to Rural Areas and Promoting Opportunities for Rural Telephone Companies To Provide Spectrum-Based Services*, Report and Order and Further Notice of Proposed Rule Making, 19 FCC Rcd 19078, 19086-88, paras. 10-12 (2004) (*2004 Report and Order*).

46.     Figure A-33 presents LTE coverage by individual service provider of both the rural and non-rural U.S. population.  Our estimates show that each of the four nationwide service providers covers at least 97% of the non-rural population with LTE.  Regarding LTE coverage in rural areas, Verizon Wireless covered approximately 94%, AT&T covered approximately 92%, T-Mobile covered approximately 85%, and Sprint covered approximately 63% of the rural population with LTE.



Source: Based on actual area coverage analysis of December 2017 Form 477 and 2010 Census data.  That a particular service provider has indicated that it has network coverage in a particular census block does not necessarily mean that it offers service to residents in that census block.



Source: Based on actual area coverage analysis of December 2017 Form 477 and 2010 Census data.  That a particular service provider has indicated that it has network coverage in a particular census block does not necessarily mean that it offers service to residents in that census block.